Defendant, Pete J. Buffo, was tried on the charge of aiding and abetting securities fraud, directly or indirectly, in connection with the offer, sale, or purchase of surplus notes issued by Vanguard Security Life Insurance Company (Vanguard) and in violation of Code 1975, § 8-6-17. The jury found the defendant guilty and he was fined $4,000.00 and sentenced to three years in the state penitentiary. Appeal was taken to the Court of Criminal Appeals, 415 So.2d 1146 where the case was reversed. The State petitioned this Court for a writ of certiorari to review the decision below. Because of errors in applying certain provisions of the Alabama Securities Act, we reverse.
Vanguard maintained offices in Montgomery, Alabama, and therefore was subject to the regulations of the Alabama Department of Insurance. On December 31, 1973, Vanguard was insolvent and its capital impaired. Unless this insolvency was cured, receivership proceedings could have been instituted by the Commissioner of Insurance. To solve this problem, Vanguard contracted to purchase property, provided that the property could be valued at not less than $1,180,755.00. In payment therefor, Vanguard was to issue its surplus notes.
Buffo is a California real estate appraiser. On June 3, 1974, he submitted an appraisal report to Vanguard valuing certain property located near Palm Springs, California. Defendant valued a 360-acre tract of remote and inaccessible mountainside property known as "slope property" at $2,000.00 per acre. Defendant's appraisal report was addressed to the corporate secretary of Vanguard. In the report, the defendant certified that neither his employment nor his compensation was contingent upon the value he reported. The report also stated that it could not be "used for any purpose by [anyone] except the addressee without the previous written consent of the appraiser."
The appraisal submitted by Buffo was required by the terms of a real estate purchase agreement between Vanguard and Dari-International, Inc., a Washington corporation doing business in California. The contract for the purchase of the property was dated June 30, 1974. Under the terms of the contract, Dari-International, the seller, had the choice of either of two plans for Vanguard's payment of the purchase price. Dari-International had the option to receive eight surplus notes[1] in the amount of $50,000.00 each and one surplus note in the amount of $55,777.00, or in the alternative, Dari-International could receive one-half of the net profits derived from the subdivision, development, and sale of the land, plus a *Page 1160 
surplus note in the amount of $50,000.00. The surplus notes were payable only if on or by their due dates Vanguard's capital and surplus exceeded $3,100,000.00. In essence, Dari-International was to transfer property approximately equal in value to what it received from Vanguard.[2] Additionally, the contract provided that an appraisal report, prepared by appraisers acceptable to the Alabama Department of Insurance, must demonstrate the market values of two parcels of property, including the one parcel appraised by the defendant, to be no less than $1,180,775.00. On June 30, 1974, the same day the sale contract was executed, Dari-International elected to take the second option and Vanguard executed a surplus note in the amount of $50,000.00 with six percent interest due on or before June 30, 1979.
An examiner with the Alabama Department of Insurance testified that Vanguard was insolvent by $474,000.00 on December 31, 1973. Vanguard's insolvency was cured, however, in June or July of 1974 by the purchase of two parcels of land in California and two parcels in Tennessee. The value attributed to the combined real estate totalled $1,509,918.00. Because of this representation, Vanguard appeared to have a net worth of $478,773.00 on December 31, 1974. In the absence of the $2,000.00 per acre appraisal on the 360 acres of slope property, submitted by Vanguard to the Alabama Department of Insurance, Vanguard would not have been solvent and would have been placed into receivership at that time. The surplus note for $50,000.00 given to Dari-International by Vanguard was not registered under the security laws of Alabama.
In early 1976, the defendant engaged Nelson Thompson, a real estate appraiser from Los Angeles, California, to appraise the 360-acre slope property for him. Buffo gave Thompson a copy of his 1974 appraisal report in which the defendant had valued the parcel at $2,000.00 per acre. Thompson, however, appraised the 360 acres of slope property at $55.00 per acre. In addition, he appraised another parcel, 290 acres of "wash" valley property, and found the value of that property to be between $250.00 and $400.00 per acre. When Thompson submitted his reports to the defendant, Buffo replied, "Hell, the appraisal that I put together [in 1974] is much higher, how am I going to look when I send these down with your figures?" The defendant then stated, "For what you get paid we'll have to change this around." Buffo and Thompson then changed the appraisal and Thompson's original appraisal was destroyed in the defendant's office. Defendant told Thompson that Vanguard needed the appraisals for a capital statement. The altered appraisals valued the 360-acre tract at $4,000.00 per acre and the 290-acre tract at $5,000.00 per acre. Thompson refused to sign the altered appraisals, but saw the defendant sign them. These appraisals were then turned over to Vanguard.
The 1976 appraisals, likewise, it seems, had to reflect a preconceived value. As a result of the inflated appraisals, Buffo's appraisals accounted for $2,890,000.00 of the $3,100,000.00 that Vanguard subsequently claimed as assets.
Thompson also testified that when an investigator from the Alabama Insurance Department attempted to verify the accuracy of Buffo's appraisals, Buffo asked Thompson not to talk with him. Thompson further testified:
 "A. Yes, the telephone conversation was sort of a hurried hurried, rush rush conversation. Are you gonna be there very long, I said, yes I'll be here all evening and he said if anybody calls you don't say anything I'll explain when I get there, I'm bringing your check.
"Q. Okay. *Page 1161 
 "A. So he came very rapidly and when he was giving me the check he asked did anyone contact me from Alabama and I said no why should they. So he mentioned there was a guy by the name of Hartley that had introduced Bob Hill and he's out here from Alabama and he would probably be calling on me and he would suggest that I don't tell him anything and then he asked where was a place to eat and left the office."
Robert Hill, a real estate appraiser from Palm Springs, California, appraised the two parcels at the request of the Alabama Department of Insurance. His examination of the property showed that the 360-tract was worth $50.00 per acre for a total value of $18,000.00 and that the 290-acre tract was worth $330.00 per acre for a total value of approximately $95,000.00.
Vanguard did business in Alabama from June 30, 1974, until the Alabama Department of Insurance placed the company in receivership on November 29, 1976. At the present time, Vanguard has 1,880 unpaid claims totaling $2,137,852.66.
At the conclusion of the State's case, the defendant moved to exclude the evidence on the grounds that the State had failed to prove a prima facie case of securities fraud, and that no evidence was presented to prove a conspiracy between the defendant and Vanguard to defraud the Alabama Department of Insurance. Defendant's motion to exclude was denied, but the trial court instructed the jury that they could consider the 1976 appraisal only for the purpose of determining the defendant's intent, since there was no evidence a security was issued in 1976.
In reversing the trial court, the learned Court of Criminal Appeals misconstrued the coverage of the securities laws in criminal prosecutions. That court stated that "there is not one shred of evidence that [Buffo] conspired with Vanguard `in connection with the offer, sale, or purchase of any security' in order to defraud the Alabama Department of Insurance," and that there "is not even a scintilla of evidence that [Buffo] knew his 1974 appraisal would be submitted to the Department of Insurance." The Court of Criminal Appeals, as a result of its incorrect application of Federal Rule 10b-5 civil principles to criminal prosecutions also held that neither Buffo nor Vanguard had violated Code 1975, § 8-6-17, stating that "[t]his was simply not a case involving securities fraud." Finally, the Court of Criminal Appeals incorrectly held that no securities fraud existed because "[n]either Vanguard, its stockholders, creditors, nor the Alabama Department of Insurance were adversely affected by the issuances of the surplus note. No investor was victimized."
The Alabama Securities Commission, pursuant to Code 1975, §8-6-18 (c), is charged with the enforcement of the provisions of the Securities Act of Alabama. This includes § 8-6-17, which the defendant, Buffo, is charged with violating, and which provides:
 "It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:
 "(1) Employ any device, scheme or artifice to defraud;
 "(2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 "(3) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."
Code 1975, § 8-6-17.
In Manson v. State, 349 So.2d 67, 73 (Ala.Cr.App.), cert.denied, 349 So.2d 86 (Ala. 1977), as well as in this action, the Court of Criminal Appeals stated that Code 1975, § 8-6-17, is identical "in all respects, other than the insertion of the word `offer,' and that which is necessary to a delineation between the area of sovereignty of Alabama and that of the United States" to Rule 10b-5 of the Securities and Exchange Commission. See, 17 C.F.R. § 240.10b-5 *Page 1162 
(1981). Therefore, since there are few Alabama cases construing the Alabama securities laws, federal cases should be reviewed to aid in the proper interpretation of the corresponding sections of Alabama statutory law inasmuch as the sections are virtually identical. Gallion v. Alabama Market Centers, Inc.,282 Ala. 679, 213 So.2d 841 (1968).
The Court of Criminal Appeals held that all three counts of Buffo's indictment failed to charge him with the substantive offense of securities fraud. It is true that the indictment does not charge in a single terse statement that Buffo, in connection with the offer, sale, or purchase of any security, directly or indirectly employed any device, scheme, or artifice to defraud. The language of the indictment does track, however, the language of § 8-6-17 and states in pertinent part:
 "Count I . . . Pete J. Buffo . . . did, in connection with the offer, sale, or purchase of any security . . . directly or indirectly employ a device or devices, scheme or schemes, or artifice or artifices to defraud, to-wit: . . . Buffo did aid, abet encourage or otherwise assist Vanguard to falsify, inflate, or exaggerate appraisals of certain real estate owned or held by Vanguard. . . ."
This indictment is sufficient to bring Buffo within the scope of § 8-6-17. See, SEC v. Penn Central Co., 450 F. Supp. 908
(E.D.Pa. 1978); Gray v. State, 364 So.2d 694, 699 (Ala.Cr.App. 1978).
In holding that the acts of Buffo and Vanguard did not violate § 8-6-17 and did not constitute securities fraud, the court below stated that certain principles applicable in federal civil cases, such as the Birnbaum rule, were directly applicable in this criminal prosecution. In Birnbaum v. NewportSteel Corp., 193 F.2d 461 (2d Cir. 1952), it was held:
 "[Section 10 (b)] was directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs, and . . . Rule X-10B-5 extended protection only to the defrauded purchaser or seller."
193 F.2d at 464. This rule, however, requires only that a plaintiff in a civil suit asserting a claim for damages under Rule 10b-5 be either a purchaser or seller of securities. BlueChip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917,44 L.Ed.2d 539 (1975). The Birnbaum rule was undoubtedly intended only as a standing rule for private rights of action and is not applicable to criminal prosecutions or suits by the Securities and Exchange Commission (SEC). See, 5 A. Jacobs, TheImpact of Rule 10b-5, § 38.01 [d] at 2-48 (rev. 1980). This is best stated by the case of SEC v. Wong, 252 F. Supp. 608, 611
(D.P.R. 1966):
 "This is the case of a public agency enforcing public policy. The Commission does not have to engage in the purchase or sale of securities. In order to bring suit under the statutes which it has a duty to enforce, a regulatory agency need not be itself the victim. The Commission acts here under the authority of the Securities Exchange Act to protect the public and not to protect itself as an investor. Section 21 (e) of the Securities Exchange Act permits the Commission to institute an action to enjoin violations of the provisions such as those allegedly involved here, or, similarly, any provision of the Act or the Rules thereunder, with no further allegations than that the defendants are engaged in acts and practices which have violated Section 10 (b) or Rule 10 (b)(5)."
252 F. Supp. at 611. Thus, it is obvious that the standing requirements of Birnbaum impose no limitations on the SEC to bring actions under § 10 (b) and Rule 10b-5. See also, BlueChip Stamps v. Manor Drug Stores, 421 U.S. 723, 751 n. 14,95 S.Ct. 1917, 1932 n. 14, 44 L.Ed.2d 539 (1975); SEC v. NationalSecurities, Inc., 393 U.S. 453, 467 n. 9, 89 S.Ct. 564, 572 n. 9,21 L.Ed.2d 668 (1969); SEC v. Savoy Industries, Inc.,587 F.2d 1149, 1171 (D.C. Cir. 1978), cert. denied sub nom. Zimmerman v.SEC, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); UnitedStates v. Charnay, 537 F.2d 341, 349 n. 11 *Page 1163 
(9th Cir.), cert. denied, 429 U.S. 1000, 97 S.Ct. 527,50 L.Ed.2d 610 (1976); United States v. Persky, 520 F.2d 283, 288
n. 9 (2d Cir. 1975). Applying these principles to the Alabama Securities Act and the case at bar, it becomes apparent that the Court of Criminal Appeals erred when it held that theBirnbaum rule was directly applicable to this case. Likewise, when the United States Supreme Court adopted the Birnbaum rule in Blue Chip Stamps, it merely decided that the remedies of § 10 (b) and Rule 10b-5 were not available to nonpurchasers and nonsellers in private civil damage suits. The Court expressly rejected the idea that the purchaser-seller requirement imposed any limitations on the SEC or the regulatory agencies of the states to bring actions for violations under their respective securities laws. 421 U.S. at 751 n. 14, 95 S.Ct. at 1932 n. 14.
Buffo contends that the Court of Criminal Appeals was correct in holding that neither Vanguard, its stockholders, or its creditors, nor the Alabama Department of Insurance was adversely affected by the issuance of the surplus note and that no investor was victimized. Buffo also contends that the Court of Criminal Appeals was correct in holding that there was no evidence to show that he knew that his 1974 appraisal would be submitted to the Alabama Department of Insurance. This raises the primary issues of this case — that is: (1) What must be shown to establish that an act is "in connection with" the offer, purchase, or sale of a security, and (2) is the State required to prove specific intent to violate the Alabama Securities Act?
The Court of Criminal Appeals' holding that the actions of neither Buffo nor Vanguard were in violation of § 8-6-17
appears to be grounded upon remoteness and a lack of causal connections. The court quoted the United States Supreme Court in its opinion in Superintendent of Insurance of New York v.Banker's Life Casualty Co., 404 U.S. 6, 92 S.Ct. 165,30 L.Ed.2d 128 (1971), a civil action, where that Court stated that in enacting § 10 (b), Congress "did not seek to regulate transactions which constitute no more than internal corporate mismanagement."[3] In Banker's Life, the defendants financed the purchase of Manhattan Casualty Company by converting Manhattan's own assets to their use. Manhattan's records showed only a sale of its assets and use of the proceeds to buy a certificate of deposit. Banker's Life received its five million dollars and the defendants became the sole owners of Manhattan. The only parties injured were the policy holders, the creditors of Manhattan, and the State of New York. Justice Douglas, in a unanimous decision, wrote:
 "The fact that the fraud was perpetrated by an officer of Manhattan and his outside collaborators is irrelevant to our problem. For § 10 (b) bans the use of any deceptive device in the "sale" of any security by "any person." And the fact that the transaction is not conducted through a securities exchange or an organized over-the-counter market is irrelevant to the coverage of § 10 (b). Hooper v. Mountain States Securities Corp., 5 Cir., 282 F.2d 195, 201. Likewise irrelevant is the fact that the proceeds of the sale that were due the seller were misappropriated.
. . . .
 "The Congress made clear that `disregard of trust relationships by those whom the law should regard as fiduciaries, are all a single seamless web' along with manipulation, investor's ignorance, and the like. . . . Since practices `constantly vary and where practices legitimate for some purposes may be turned to illegitimate and fraudulent means, broad discretionary powers' in the regulatory agency `have been found practically essential.' . . . Hence we do not read § 10 (b) as narrowly as the Court of Appeals; it is not `limited to preserving the integrity of the securities markets' . . ., though that purpose is included. Section 10 (b) must *Page 1164 be read flexibly, not technically and restrictively. Since there was a `sale' of a security and since fraud was used `in connection with' it, there is redress under § 10 (b), whatever might be available as a remedy under state law. [Emphasis added and citations omitted]."
404 U.S. at 10-12, 92 S.Ct. at 168-169. Thus the Court approved a loose nexus between the fraud and the securities transaction made in connection with it. When referring to causation, the Court stated that "[t]he crux of the present case is that [the defrauded corporation] suffered an injury as a result of deceptive practices touching its sale of securities as an investor." (Emphasis added.) 404 U.S. at 12-13,92 S.Ct. at 169. See also, Rich v. Touche Ross Co., 415 F. Supp. 95, 100
(S.D.N.Y. 1976).
Other federal courts have followed this line of reasoning and have held that a "classic 10b-5 violation" occurs when a defendant has "caused the corporation to issue materially false statements." Landy v. Federal Deposit Insurance Corp.,486 F.2d 139, 163 (2d Cir. 1973). See also, SEC v. Penn Central Co.,450 F. Supp. 908, 912 (E.D.Pa. 1978).
As has been observed by several commentators, courts should be careful not to confuse the civil fraud concepts of reliance, privity, causation, and the purchaser-seller requirement with the connection or nexus requirement. When nexus is the issue to be determined, the essence of the question becomes whether the fraud has a sufficiently close relationship to the purchase or sale of the security to make it actionable. The cases make it apparent that the fraud does not have to be intrinsic to the specific securities transaction. See 3B H. Bloomenthal,Securities and Federal Corporate Law, § 11.12 at 11-45 (1977). Professor Jacobs has further stated:
 "The `in connection with' clause would ordinarily be fulfilled if a securities transaction is involved in some way, even though the fraud did not occur in the purchase or sale that is attacked (assuming the fraud and securities transaction can be integrated into the same scheme), the deceit did not concern the terms of the securities transaction, the claimant was not a party to the deceptive transaction, the fraud and the loss were merely indirectly connected, the securities transaction was only tangentially related to the fraudulent course of conduct, and the fraud was not aimed at causing a purchase or sale of a security."
5 A. Jacobs, supra at § 38.01 [b] at 2-36. Rule 10b-5 has been extended in a number of cases where the fraud was indirectly related to the purchase or sale, including cases where there was a misrepresentation of the value or the consideration paid for it. See, Exchange National Bank of Chicago v. Touche Ross Co., 544 F.2d 1126, 1134 n. 12 (2d Cir. 1976) (fraud involving the thing given for the security); Hooper v. Mountain StatesSecurities Corp., 282 F.2d 195, 202-03 (5th Cir. 1960), cert.denied, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961) (fraud in the consideration received); Allen Organ Co. v. NorthAmerican Rockwell Corp., 363 F. Supp. 1117, 1127-1128 (E.D.Pa. 1973) (misrepresentation concerning consideration). See also,Emisco Industries, Inc. v. Pro's Inc., 543 F.2d 38, 40 (7th Cir. 1976); Eason v. General Motors Acceptance Corp.,490 F.2d 654, 656 (7th Cir. 1973), cert. denied, 416 U.S. 960,94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).
Applying the foregoing to the case at bar, it becomes obvious that the court below misconstrued the applicable law when it found no evidence of a securities fraud. In 1973, when Vanguard was declared impaired, it still had some assets, although as a whole the company was insolvent. Vanguard had to find a method by which its capital could be increased in order to avert being placed in receivership. The method employed was the issuance of a surplus note in exchange for real estate. The value of that real estate, as determined by Buffo's appraisal, was included in Vanguard's capital statement. Furthermore, the surplus debenture note issued by Vanguard for the purchase price of the property was required by the sale contract to be *Page 1165 
appraised at a predetermined value. Since the note could only be paid from surplus, and since there was no real expectation of Vanguard ever having a surplus, the entire transaction was a sham. Vanguard gave up virtually nothing, received virtually nothing, but still was able to claim over $1,000,000.00 in assets on its capital statement, thereby defrauding the Alabama Department of Insurance and delaying the institution of receivership proceedings.
There is no doubt that the fraud perpetrated against the Alabama Department of Insurance was "in connection with" the transaction involving the security. The scheme involved the valuation of the consideration given for the security and it is clear that Buffo's part in this scheme was crucial. Section8-6-17 was intended to prohibit all fraudulent schemes in connection with the offer, sale, or purchase of securities. This is true whether or not "the artifices employed involve a garden-type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." A.T. Brod Co. v. Perlow,375 F.2d 393, 397 (2d Cir. 1967).
As to whether the State must prove specific intent in a securities case, reference to the Comments and Commissioners' Notes to the Uniform Securities Act, after which the Securities Act of Alabama is modeled, are instructive. The comments to § 409 (a), which is similar to Code 1975, § 8-6-17, refer the reader to the comments under § 204 (a)(2)(B) and provide:
 "As the federal courts and the SEC have construed the term `willfully' . . . all that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing. Proof of evil motive or intent to violate the law, or knowledge that the law was being violated, is not required."
1 Blue Sky L.Rep. (CCH) ¶ 5524 at 1513 (1980). As required by the statute, Buffo was charged with willfully engaging in fraudulent conduct in connection with the offer, sale, or purchase of a security.
While Alabama cases have held that there must be a guilty knowledge or mens rea, Favor v. State, 389 So.2d 556, 562
(Ala.Cr.App. 1980); Van Antwerp v. State, 358 So.2d 782
(Ala.Cr.App.), cert. denied, 358 So.2d 791 (Ala. 1978); Mansonv. State, 349 So.2d 67 (Ala.Cr.App.), cert. denied,349 So.2d 86 (Ala. 1977), federal cases have held this to mean:
 "We think that the government is required to prove specific intent only as it relates to the action constituting the fraudulent, misleading or deceitful conduct, but not as to the knowledge that the instrument used is a security under the Securities Act. The government need only prove that the object sold or offered is, in fact, a security; it need not be proved that the defendant had specific knowledge that the object sold or offered was a security.
. . . .
 ". . . [W]here inclusion of the instrument in question in the definition of a security in the context of a fraud case is itself a jural fact, the knowledge and belief of the defendant with respect to this is not a relevant fact requiring proof."
United States v. Brown, 578 F.2d 1280, 1284 (9th Cir. 1978). A party can willfully violate a securities law without knowing of its existence. United States v. Peltz, 433 F.2d 48 (2d Cir. 1970). It is reasonable to assume that one who connects himself so closely with such a transaction has an interest in that transaction and it places upon him the duty to stay informed as to the consequences of such a transaction. Van Riper v. UnitedStates, 13 F.2d 961, 966 (2d Cir. 1926). Thus, intent to deceive means "intent to say something, that is expected to be relied on, that is not believed to be true, or, if strictly true, is hoped will be understood in an untruthful sense." SECv. World Radio Mission, Inc., 544 F.2d 535, 540 (1st Cir. 1976). Knowledge that the act is in violation of the securities laws, or that the instrument in question is a security, is not a relevant fact requiring proof. See, United States v. Riedel,126 F.2d 81 (7th Cir. 1942). For federal cases holding scienter *Page 1166 
unnecessary, see, SEC v. Universal Major Industries Corp.,546 F.2d 1044, 1047 (2d Cir. 1976), cert. denied sub nom. Homans v.SEC, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); UnitedStates v. Schwartz, 464 F.2d 499 (2d Cir. 1972); Gearhart andOtis, Inc. v. SEC, 348 F.2d 798 (D.C. Cir. 1965); SEC v. PennCentral Co., 450 F. Supp. 908, 918 (E.D.Pa. 1978); United Statesv. Custer Channel Wing Corp., 247 F. Supp. 481 (D.Md. 1965),aff'd, 376 F.2d 675 (4th Cir.), cert. denied, 389 U.S. 850,88 S.Ct. 38, 19 L.Ed.2d 119 (1967).
Applying the foregoing to the facts of this case, it is clear that, contrary to the holding of the Court of Criminal Appeals, there was sufficient evidence from which the jury could have properly found that the defendant willfully violated § 8-6-17. Evidence was introduced that in 1974, Buffo knowingly prepared a false real estate appraisal, valuing remote and inaccessible mountainside property at forty times its actual worth. Testimony such as the conversations between Buffo and others, the contract between Vanguard and Dari-International calling for a preconceived valuation of the property, and Buffo's attempt to prevent Thompson from talking to the representative of the Alabama Insurance Department provide sufficient evidence for a jury to conclude that the defendant knew the appraisal would be used by Vanguard in its capital statement and that the property must show such a preconceived value.
Finally, the Court of Criminal Appeals held that there was not one scintilla of evidence, either direct or circumstantial, to show that Buffo conspired with Vanguard. In Conley v. State,354 So.2d 1172 (Ala.Cr.App. 1977), however, the Court of Criminal Appeals stated:
 "In order that the fact of a conspiracy may be established, it need not be proved by evidence of an express agreement or compact between the alleged conspirators, or by any direct evidence of any agreement or compact. It may be proved inferentially, or by circumstantial evidence. Conspiracies from their very nature are usually entered into in secret, and are consequently difficult to be reached by positive testimony, which renders it peculiarly necessary and proper to permit them to be inferred from the circumstances."
354 So.2d at 1177. From the testimony given, there was sufficient evidence given for the jury to infer from the circumstances that a conspiracy existed.
Although it is contended that the state is attempting to combine two causally unconnected transactions; that is, the issuance of the security for the property and Vanguard's misrepresentations to the Alabama Department of Insurance; it is clear that the actions of Vanguard and of Buffo were all in connection with the issuance of the security. Buffo's appraisals accounted for nearly all of Vanguard's claimed assets and forestalled the institution of receivership proceedings by "curing" Vanguard's insolvency in both 1973 and 1975. Buffo apparently had enough knowledge that his appraisals were fraudulent that he would try and prevent Mr. Thompson from talking to Mr. Hartley of the Alabama Department of Insurance. Since Buffo's actions and appraisals were "in connection with" the issuance of the security, and since there was evidence adduced that he knew the appraisals to be fraudulent, we find that the decision of the Court of Criminal Appeals is due to be reversed and the case remanded.
REVERSED AND REMANDED.
MADDOX, FAULKNER, JONES, SHORES, EMBRY and ADAMS, JJ., concur.
ALMON and BEATTY, JJ., dissent.
[1] A surplus note is a specialized type of promissory note by which the promisor agrees to pay the agreed principal amount and interest only if and when the company's financial condition is such that it has capital and surplus in excess of a stated amount.
[2] Charles Skinner, an employee with the Alabama Department of Insurance, testified that a small amount of cash, approximately $5,000.00, was transferred from Vanguard to Dari-International. Thus, the small amount of cash plus the prospect of receiving one-half of any profits realized on resale by Vanguard made the exchanges approximately equal in value.
[3] The Court continued: "But we read § 10 (b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face." 404 U.S. at 12,92 S.Ct. at 169.