[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 784 
 ON APPLICATION FOR REHEARING
The original opinion issued on May 28, 1993, in this case is withdrawn, and this opinion is substituted therefor. Astrid M. Bayhi, Cyril H. Bayhi, Jr.,[1] and Phillip H. Newman[2] were jointly indicted in 25 indictments, each containing 5 separate counts, for (1) selling or offering to sell securities without first having registered as a salesperson with the Securities Commission of Alabama, in violation of § 8-6-3, Code of Alabama 1975; (2) selling or offering to sell unregistered securities, in violation of §8-6-4; (3) employing a device, scheme or artifice in offering to sell or in selling a security, in violation of §8-6-17(a)(1); (4) making an untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with *Page 785 
the offer to sell or the sale of a security, in violation of § 8-6-17(a)(2); and (5) engaging in an act, practice, or course of business that operates or would operate as a fraud or deceit upon a person, in violation of § 8-6-17(a)(3).
Eleven of the indictments concern the unlawful sales or registration of stocks, and fourteen concern the unlawful sales or registration of promissory notes. As to the indictments concerning the stock: Count I avers that Astrid, Cyril, and Newman, without first registering as salespersons with the Securities Commission of Alabama, sold or offered to sell common stock of Industrial Medical Specialists, Inc. (hereinafter "IMSI"), d/b/a Newman First Aid (hereinafter "NFA") and New Health Group (hereinafter "NHG"), in violation of § 8-6-3. Count II avers that Astrid, Cyril, and Newman sold or offered to sell the unregistered common stock of IMSI, in violation of § 8-6-4. Count III avers that Astrid, Cyril, and Newman, in connection with the sale or offer to sell stock, employed a device, scheme, or artifice to defraud investors by misrepresenting the use of the proceeds from the stock sales, by misrepresenting the capitalization and long-term debt of IMSI, by misrepresenting the anticipated increase in value of the stock, and by misrepresenting that the prospectus was complete and correct in all material respects and that it fairly presented the financial condition of the corporation, in violation of § 8-6-17(a)(1). Count IV avers that Astrid, Cyril, and Newman, in connection with the sale or offer to sell stock, made untrue or misleading statements to investors by misrepresenting or omitting to state certain facts regarding the appreciation in value of the stock, the fixed dividend rate, the use to be made of the proceeds from the stock sales, and the anticipated rate of increase in the value of the stock, and by failing to disclose that, because they were attempting to convert promissory notes to common stock, the purpose of the stock offering would fail, in violation of § 8-6-17(a)(2). Count V avers that Astrid, Cyril, and Newman, in connection with the sale or offer to sell stock, engaged in an act, practice, or course of business that operated or would have operated as a fraud or deceit upon investors, in violation of §8-6-17(a)(3), by failing to inform them of a petition in bankruptcy previously filed by Newman; by failing to inform them that the interim balance sheet of IMSI dated October 31, 1989, and distributed along with the prospectus did not fairly represent the true financial condition of IMSI; by failing to inform them that if all the promissory notes were converted to common stock, the actual proceeds from the stock offering would be so reduced as to nullify the stated purpose of the stock sales; by misrepresenting to them that the financial statements attached to the prospectus were complete and correct and that all material fairly represented the financial condition of IMSI on the date the financial statement was issued; by misrepresenting to them that the stock offering would generate $980,000 for IMSI; by misrepresenting to them that the proceeds would be used to expand the business; and by failing to inform them that more shares of the common stock of IMSI had been sold than had been authorized.
As to the indictments concerning the promissory notes: Count I avers that Astrid, Cyril, and Newman, without first having been registered as salespersons, sold or offered to sell a security defined as an investment contract or certificate of interest or participation in a profit-sharing agreement in the form of promissory notes issued by Phillip H. Newman, Phillip H. Newman d/b/a NFA, Phillip H. Newman d/b/a NFA and NHG, or IMSI d/b/a NFA and NHG, in violation of § 8-6-3. Count II avers that Astrid, Cyril, and Newman sold or offered to sell promissory notes without those notes being registered, in violation of § 8-6-4. Count III avers that Astrid, Cyril, and Newman, in connection with the sale or offer to sell securities, employed a device, scheme, or artifice to defraud investors, in violation of § 8-6-17(a)(1), specifically by misrepresenting that the return on the investment on a two-year promissory note would be 100%; by misrepresenting that, in the event of default, the entire balance due on the notes would be payable at the election of the investor and that IMSI would pay all costs of collecting and providing security for the notes; by misrepresenting that IMSI was offering one million shares of common stock for sale at *Page 786 
$1.00 per share and that the proceeds would be used to expand the business; by misrepresenting that investors could convert their promissory notes to common stock at $1.00 per share; and by misrepresenting that the value of the stock would increase to $3.00 per share in two years. Count IV avers that Astrid, Cyril, and Newman, in connection with the sale or offer to sell securities, made untrue or misleading statements to investors, in violation of § 8-6-17(a)(2), specifically by failing to inform them that Newman had previously filed a petition in bankruptcy under Chapter 7, Title 11, U.S. Code; by failing to inform them that Astrid, Cyril, and Newman were in the process of filing petitions in bankruptcy under Chapter 7, wherein the investors would be named as unsecured creditors, by misrepresenting that the corporation would pay 100% return on the investment on two-year promissory notes; by misrepresenting that, in the event of default, the entire balance due on the notes would be payable at the election of the investors; by misrepresenting that IMSI was offering one million shares of common stock at $1.00 per share and that the proceeds were to be used to expand the business; by misrepresenting that investors could convert their promissory notes to common stock in IMSI at $1.00 per share; and by misrepresenting that the value of the stock would rise to $3.00 within two years. Count V avers that Astrid, Cyril, and Newman, in connection with the sale or offer to sell securities, engaged in an act, practice, or course of business that operated or would operate as a fraud or deceit upon investors, in violation of § 8-6-17(a)(3), specifically by misrepresenting that the return on the investment on two-year promissory notes would be 100%; by misrepresenting that, in the event of default, the entire balance due on the notes would be payable at the election of the investors and that the corporation would pay all costs of collecting and providing security for the notes; by misrepresenting that the proceeds from the sale would be used to expand the business; by failing to inform the investors that Newman had previously filed a petition in bankruptcy and that Astrid, Cyril, and Newman were in the process of filing petitions in bankruptcy; and by failing to inform them that IMSI was indebted in excess of $1,000,000 to holders of promissory notes.
The Bayhis were tried jointly before a jury. Astrid was convicted on all 125 counts. Cyril was convicted on 70 counts — all 5 counts of each of the 11 indictments involving stock and Counts III, IV, and V of five of the indictments involving promissory notes. The trial court had granted Cyril's motion for a judgment of acquittal on Counts I and II of the 14 indictments involving promissory notes, and the jury found him not guilty on Counts III, IV, and V of the remaining 9 indictments involving promissory notes. Astrid was sentenced to five years' imprisonment on each count, and Cyril to three years' on each count. The sentences were ordered to be served concurrently. In addition (on one count only), Astrid was fined $2,000 and Cyril $1,000. Astrid was ordered to pay $252,043.67 and Cyri to pay $115,606.50 in restitution.
Astrid and Cyril appeal, both raising the same four issues. Their first three issues question the sufficiency of the evidence to support their convictions for selling or offering to sell unregistered securities, (§ 8-6-4), for selling or offering to sell securities without first registering as a securities salesperson (§ 8-6-3), and for defrauding investors by committing acts prohibited by § 8-6-17(a)(1), (2), and (3). In their fourth issue, they contend that the trial court erred in allowing into evidence collateral stock transactions not charged in the indictments.
The state's evidence discloses that Newman founded a first-aid supply business as a sole proprietorship in 1984, which operated under the name of "Newman First Aid." In 1986, Newman changed the name of the business to "Newman Health Group" and expanded its business activities from the sale and service of first-aid supplies to include industrial health and safety training and consultation services. On October 1, 1987, according to the Articles of Limited Partnership, Newman, Astrid, Cyril, and others formed a limited partnership under the name "Newman First Aid Limited" to operate the business. Newman, Astrid, and Cyril were the general partners. There were a number of limited partners. According to the articles, *Page 787 
Newman's capital contribution was $50,000, Astrid's was $40,000, and Cyril's was $10,000. Astrid served as "education director" and Cyril as "safety engineer." During that time, Astrid and Cyril worked part-time with the business.
On January 24, 1989, the business was incorporated as "Industrial Medical Specialties, Inc." The certificate of incorporation shows that Newman and Astrid were the incorporators and that Newman, Astrid, and Cyril were the directors as well as the stockholders. Astrid had subscribed to 510 shares of stock, Newman to 390 shares, and Cyril to 100 shares. Astrid served as president and Newman as secretary-treasurer. Newman, Astrid, and Cyril were active in the day-to-day management of the business. On August 30, 1989, the three stockholders adopted a resolution authorizing the issuance of 1,000,000 shares of common stock at a par value of $1.00. The resolution also authorized the sale of the stock to private investors at par value, and provided that the sale would be underwritten by the officers of the corporation. In December 1989 or January 1990, Astrid and Cyril began devoting full time to the business.
The sale of the stock was launched at the corporation's annual stockholders meeting on December 1, 1989, in Dothan. In addition to the three officers/stockholders, 25 potential investors were present. Newman urged the potential investors to purchase the stock and spoke of guaranteed quarterly dividends and a doubling in value of the stock in two years. Astrid stated that business was so good that she had left her nursing job to devote full time to the company. The prospectus, which was distributed to those present, listed Astrid as president, Cyril as executive director, and Newman as chairman of the board, with annual salaries of $37,500 each, and stated that these individuals were important to the management and continued success of the company and were active in the day-to-day operations of the company. The prospectus also stated that the proceeds from the stock sale would be used to expand the business. Attached to the prospectus was a financial statement purporting to disclose the current financial condition of the corporation. Stock sale agreements distributed to the potential investors stated that the officers and directors of the corporation were authorized to sell the stock. From December 1, 1989, until the Securities Commission issued a cease and desist order on March 13, 1990, to halt the sale, 1,053,869 shares of stock were issued. The stock certificates were signed by Astrid as president of the corporation and by Newman as secretary-treasurer.
Beginning in 1986 and extending well into 1990, the business had raised large amounts of money, ostensibly for expansion capital, by issuing promissory notes[3] to individual investors. Newman signed these notes as "Phillip Newman," in his individual capacity or as "Phillip Newman d/b/a NFA," "Phillip Newman d/b/a NHG," "Phillip Newman d/b/a Newman First Aid Limited," "Phillip Newman d/b/a IMSI" or "IMSI," and most were notarized or witnessed by Astrid. The investors were promised a high rate of return on their notes, and most of them were advised or encouraged to "roll over" the amount due on the notes at maturity into new notes or into common stock of IMSI. Most did so.
The records of the issuance of promissory notes and stock certificates were kept with the records of IMSI. Bank transactions disclose a commingling of funds of the various entities as well as transfers of company funds in and out of Astrid's and Newman's personal bank accounts. Even though transactions were carried on in the name of several entities, i.e., "Phillip Newman," "Phillip Newman d/b/a NFA," "Phillip Newman d/b/a NHG," "Phillip Newman d/b/a Newman First Aid Limited," "Phillip Newman d/b/a IMSI" or "IMSI," clearly there was only one business. *Page 788 
In the beginning, some investors made substantial profits; however, they usually immediately reinvested in even larger amounts.
None of the securities that were sold (which included the stock and the promissory notes) were ever registered with the Securities Commission, nor were Newman, Astrid, or Cyril or any other person connected with the corporation or any of its entities that may have acted in its behalf ever registered as salespersons with the Commission. There was testimony that the investors were given false and misleading information about the financial condition of the corporation. For example, the financial statement furnished to the investors on October 16, 1989, showed the company debt as $285,000.00, when, according to testimony at trial, the debt of the corporation at that time was $699,293.92, and by January 1, 1990, it was $1,106,389.06. The records of the corporation failed to account for the revenues generated by the sale of stock and the issuance of the promissory notes. There was testimony from which the jury could have inferred that representations as to the growth of the business and the need for capital to expand in order to get the investors to purchase stock or invest in promissory notes were false and misleading. In fact, the business was not expanding, but was losing money. There was also testimony that representations as to the anticipated increase in value of the stock and that dividends that could be expected and the anticipated return on the promissory notes were also false and misleading. The investors were not informed that Newman had previously filed a petition in bankruptcy and that Newman, Astrid, and Cyril were in the process of filing petitions in bankruptcy, naming the holders of the promissory notes as unsecured creditors.
Astrid testified that she had no knowledge of the financial and "investment" aspects of the business. She stated that Newman handled all the business affairs and that, even though she had signed her name to the stock certificates and to the promissory notes, she had no knowledge of the reasons for the transactions and had signed them because her husband asked her to. She also testified that she and her father, Cyril, had no knowledge of the business affairs of the company and that they were merely employees. Cyril did not testify.
 I.
The appellants, Cyril and Astrid, contend that the evidence was insufficient to support a conviction for selling or offering to sell unregistered securities. This issue was preserved for our review by timely motions for judgments of acquittal at the close of the state's case-in-chief.
In deciding whether there is sufficient evidence to support the judgment, we must view the evidence in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). Conflicting evidence presents a jury question not subject to our review, provided that the state's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala. 1980). The trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury, when the motion was made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App. 1978).
Astrid and Cyril contend that they did not personally sell or offer to sell unregistered securities to any victim named in the indictments, that they were not "controlling persons" (as that term is used in the Securities Act of Alabama), that they did not assume managerial roles, and that they were nothing more than employees. They further contend that they did not aid and abet the sale or offer to sell unregistered securities, that they had no general awareness that their roles in the activities of the company were improper, and that their presence at meetings at which Newman discussed matters relating to the business and to the sale of securities and Astrid's signing of the notes and stock certificates did not constitute "substantial assistance."
In addressing these contentions, we begin with § 8-6-4, Code of Alabama 1975, *Page 789 
which provides, in pertinent part: "It is unlawful for any person to offer or sell any security in this state unless . . . [i]t is registered under this article." The term "offer to sell" "includes every attempt to offer or dispose of, or solicitation of an offer to buy, a security or interest in a security for value." § 8-6-2(8). A specific criminal intent or guilty knowledge that the law is being violated is not required to find criminal violations of those sections of the Alabama Securities Act prohibiting the sale of unregistered securities (§ 8-6-4) and requiring registration as a securities dealer (§8-6-3(a)); all that is required is that the state prove that the defendant acted willfully in the sense that he was aware of what he was doing. Favor v. State, 389 So.2d 556 (Ala.Cr.App. 1980).
Obviously, in addressing the participation of these appellants in this scheme, we must also consider the principle of aiding and abetting.
 " 'A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense: . . . He aids or abets such other person to commit the offense.' Alabama Code 1975, § 13A-2-23(2). 'Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its accomplishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal. No particular acts are necessary to make one an aider and abettor.' Scott v. State, 374 So.2d 316, 318-19 (Ala. 1979) (citations omitted). However, 'mere consent to a crime, when no aid is given and no encouragement rendered, does not amount to participation.' State v. Tally, 102 Ala. 25, 68, 15 So. 722, 738 (1894)."
Payne v. State, 487 So.2d 256, 261 (Ala.Cr.App. 1986).
The Alabama Supreme Court has recognized, in Buffo v. State,415 So.2d 1158, 1162 (Ala. 1982), that there are few Alabama cases construing the Alabama securities laws. The Buffo court further recognized that because of the similarity between the federal securities law and the Alabama Securities statutes, federal cases should be reviewed to aid in the proper interpretation of Alabama law. Id. "Federal courts have generally stated the requirements for aiding and abetting liability in a securities fraud case as (1) the existence of a securities law violation by the primary party, (2) general awareness of the aider and abettor that his role was part of an overall activity that is improper, and (3) substantial assistance by the aider and abettor in the achievement of the primary violation." Buffo v. Graddick, 742 F.2d 592, 597 (11th Cir. 1984). This assistance must have been knowingly provided,Securities and Exchange Commission v. Rogers, 790 F.2d 1450
(9th Cir. 1986), but a defendant need not have acted in the offer and sale of securities to be guilty as an aider and abettor. United States v. Kessi, 868 F.2d 1097 (9th Cir. 1989);United States v. Mayo, 646 F.2d 369 (9th Cir.), cert. denied,454 U.S. 1127, 102 S.Ct. 979, 71 L.Ed.2d 115 (1981).
Our review of the evidence leads us to the conclusion that there was sufficient evidence from which the jury could have properly found that Astrid and Cyril willfully violated §8-6-4, i.e., that they sold or offered to sell unregistered securities. The evidence is undisputed that the securities were not registered.
Although Astrid and Cyril did not personally negotiate the sale of the securities with the investors, there is ample evidence from which the jury could have reasonably inferred that they participated in the sale or the offer to sell unregistered securities. They were general partners in the limited partnership out of which the business grew. They were stockholders, officers, and directors in the corporation. Astrid was the president and a major stockholder. Cyril was the executive director. They were intimately involved in the day-to-day operations of the business. They attended the meetings where the securities were offered for sale and were sold. At the meetings of investors, they were introduced as key management people, and Astrid spoke as a representative of the corporation. The prospectus, which was circulated to the potential investors, showed them as key management people. *Page 790 
Astrid signed all of the stock certificates issued, witnessed and notarized most of the promissory notes, signed memoranda pertaining to the business and addressed to the investors, and signed the minutes of the meetings at which the securities were sold.
On one promissory note for $28,000, dated January 22, 1990, Astrid, in addition to signing as president, also signed in her individual capacity, thus becoming personally liable for payment of the note. Cyril also signed the note in his individual capacity. They apparently signed another promissory note for $14,000, again in their individual capacities.
On one occasion, Cyril assisted in resolving a problem with a dissatisfied investor. On another occasion, Astrid dealt with an employee who was attempting to sell stock after the cease and desist order had been issued. On July 9, 1990, Astrid and Newman, filed a petition in bankruptcy. On July 11, 1990, Cyril and his wife also filed a petition in bankruptcy. Both petitions listed the holders of the promissory notes as unsecured creditors and stated that two of the notes (one for $28,000 and one for $14,000), on which they had personally guaranteed payment, were for loans to the corporation. The remaining notes, in a total amount of $639,097, were listed as contingent liabilities for loans to the corporation. It can be reasonably inferred from the evidence that discussions about filing bankruptcy petitions were taking place while securities were still being offered for sale.
In the face of the evidence, we find incredulous Astrid's and Cyril's contentions that they had no knowledge of the financial affairs of the corporation, that they did not know that the contents of the prospectus and of the other materials given to the investors were false, and that they were merely employees. Astrid's contention that she did only what her husband told her to do and that her only participation in the activities of the corporation was social is not borne out by the evidence. The fact that Astrid and Cyril personally obligated themselves on two of the promissory notes in an amount of $42,000 indicates more than a passing interest in the financial affairs of the company. This personal participation is strong evidence of involvement in the overall scheme. Furthermore, we believe that the term "controlling person" as defined and used in the Securities Act of Alabama (see § 8-6-2(24)) is inapplicable to the facts of this case; however, we find that Newman, Astrid, and Cyril were "controlling persons" in this corporation and that they controlled the issuance of stock. See generally, 70 C.J.S. Supp., Securities Regulation § 29 (1974). In short, the evidence supports the conclusion that Newman, Astrid, and Cyril knowingly devised and executed a scheme to defraud by causing the issuance of stock and promissory notes to numerous investors who were led to invest by false and misleading statements about the financial condition and the potential of the business, which resulted in losses in the total amount of $681,097 to holders of worthless promissory notes and in the amount of $200,000 to holders of worthless stock. Because the receipt of all of these funds was not reflected in the corporation's books, it is reasonable to assume that a significant part of these investments were converted by Newman, Astrid, and Cyril for personal use.
While we believe and have held that there was sufficient evidence for a reasonable jury to have concluded beyond a reasonable doubt that Astrid and Cyril jointly participated with Newman as principals in the sale and offer to sell unregistered securities, we also believe that the state's evidence clearly established that Astrid and Cyril were accomplices of Newman, and that they aided and abetted him in the commission of the offenses. They need not have acted in the offers and sales of securities to be guilty as aiders and abettors. The state's evidence affords a reasonable inference that they were more than passive observers and that they rendered substantial assistance to Newman. All of the circumstances surrounding Newman's offer to sell and the sale of the securities along with the reasonable inferences to be drawn from the evidence support the conclusions that Astrid and Cyril were aiders and abettors, that they knowingly provided substantial assistance with an intent to promote and to encourage the sale of the securities, and that they stood ready to render whatever assistance was necessary. *Page 791 
For the above reasons, the trial court's denial of the motions for judgments of acquittal as to the counts of the indictments charging Astrid and Cyril with selling or offering to sell unregistered securities was proper.
 II.
The appellants next contend that the evidence was insufficient to convict them for failing to register as securities salespersons. This issue was properly preserved for review by timely motions for judgments of acquittal. They contend that they were not within the class of persons required to register because they did not sell or offer to sell securities. Section 8-6-3(a), provides, in pertinent part: "It is unlawful for any person to transact business in this state as a dealer or agent for securities unless he is registered under this article. . . ."
The evidence is undisputed that the appellants did not register as salespersons under the Securities Act of Alabama. We held in Part I of this opinion that they engaged in the selling or offering to sell securities in this state either as principals or as aiders and abettors. Viewing the evidence in the light most favorable to the prosecution, a jury could have reasonably found that the appellants were guilty beyond a reasonable doubt of selling or offering to sell securities without being properly registered as salespersons, in violation of § 8-6-3. The trial court's denial of the appellants' motions for judgments of acquittal as to the convictions on the counts charging failure to register as securities salespersons was proper.
 III.
The appellants next contend that the evidence was insufficient to support convictions for defrauding investors pursuant to § 8-6-17(a)(1), (2), and (3). This issue was also properly preserved for review by timely motions for judgments of acquittal. They contend that the state failed to prove the requisite intent to support their convictions for securities fraud and that the evidence failed to establish that they aided and abetted Newman in perpetrating the fraud.
Section 8-6-17, provides, in pertinent part, as follows:
 "(a) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to:
 "(1) Employ any device, scheme or artifice to defraud;
 "(2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
 "(3) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."
"Section 8-6-17 was intended to prohibit all fraudulent schemes in connection with the offer, sale, or purchase of securities. This is true whether or not 'the artifices employed involve a garden-type variety of fraud, or present a unique form of deception.' " Buffo v. State, 415 So.2d at 1165 (quoting A.T.Brod Co. v. Perlow, 375 F.2d 393, 397 (2nd Cir. 1967)). There is no doubt that the fraudulent acts charged in this case were "in connection with" the transactions involving the sale or the offer to sell the unregistered securities. While the use of the promissory notes ostensibly to raise capital is somewhat unusual, the "artifices" used here are the common "garden-type variety" of fraud.
As required by the statute, the appellants were charged with willfully engaging in fraudulent conduct in connection with the offer to sell or the sale of securities.
 "As to whether the State must prove specific intent in a securities case, reference to the Comments and Commissioners' Notes to the Uniform Securities Act, after which the Securities Act of Alabama is modeled, are instructive. The comments to § 409(a), which is similar to Code 1975, § 8-6-17, refer the reader to the comments under § 204(a)(2)(B) and provide:
 " 'As the federal courts and the SEC have construed the term "willfully" . . . all that is required is proof that the person acted intentionally in the sense that he was aware of what he was doing. Proof of evil motive or intent to violate *Page 792 
the law, or knowledge that the law was being violated is not required.'
1 Blue Sky L.Rep. (CCH) 5524 at 1513 (1980)."
Buffo v. State, 415 So.2d at 1165. "Thus, intent to deceive means 'intent to say something that is expected to be relied on, that is not believed to be true, or, if strictly true, is hoped will be understood in an untruthful sense.' " Id.
(quoting Securities and Exchange Commission v. World RadioMission, Inc., 544 F.2d 535, 540 (1st Cir. 1976)). Knowledge that the act violates the securities laws, or that the instrument in question is a security, is not relevant. Buffo v.State, 415 So.2d at 1165.
Reviewing the facts of this case in the light of the legal principles involved, we find that there was sufficient evidence from which the jury could have properly found that the appellants willfully violated § 8-6-17(a)(1) through (3), i.e., that they had the requisite intent to commit the fraudulent acts charged in the fraud counts of the indictments.
We further find that the evidence was sufficient to sustain the appellant's convictions for aiding and abetting securities fraud. As we have heretofore stated, the requirements for liability for aiding and abetting in a securities fraud case are (1) the existence of a securities law violation by a primary party, (2) general awareness by the aider and abettor that his role was part of an overall activity that is improper, and (3) substantial assistance by the aider and abettor in the achievement of the primary violation. We believe that a jury could have reasonably found, from the evidence presented, the existence of these elements beyond a reasonable doubt. The trial court's denial of the motions for judgments of acquittal as to the counts of the indictments pertaining to securities fraud was proper.
 IV.
The appellants contend that the trial court erred by allowing the state to present evidence of promissory notes and stock transactions not charged in the indictments. These transactions were similar to those charged in the indictments, they occurred in the same manner and during the same time period, and the misrepresentations preceding these transactions were made during the same meetings and in the same documents; however, the actual transactions occurred in other counties.
"In general, evidence of other or collateral crimes committed by a defendant is not admissible at his trial for a specific offense." Guthrie v. State, 616 So.2d 914, 921 (Ala.Cr.App. 1993) (quoting McLemore v. State, 562 So.2d 639, 641
(Ala.Cr.App. 1989)). There are, however, exceptions to this general rule, one of which is referred to as the "res gestae or continuous transaction" exception.
 "Evidence of the accused's commission of another crime is admissible if other crime is inseparably connected with or is a part of the res gestae of the now-charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence."
C. Gamble, McElroy's Alabama Evidence § 69.01(3) (4th ed. 1991) (footnote omitted). Another exception to the general rule is referred to as the "criminal intent" exception.
 "If the accused is charged with a crime that requires a prerequisite intent, then prior criminal acts are admissible to show that he had the necessary intent when he committed the now-charged crime. This rule is based upon the theory that, because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater likelihood that the act in question was not done inadvertently."
C. Gamble, supra, § 59.01(5) (footnotes omitted). Furthermore, "[t]he decision whether to allow evidence of collateral crimes or acts as part of the state's case-in-chief rests within the sound discretion of the trial judge." Guthrie v. State, 616 So.2d at 924 (quoting Blanco v. State, 515 So.2d 115, 120
(Ala.Cr.App. 1987)).
We find that the evidence of the collateral securities transactions was admissible under both the res gestae or continuous transaction exception and the criminal intent exception to the general exclusory rule. Further, we *Page 793 
find that the trial court did not abuse its discretion in admitting this evidence. See Saffold v. State, 494 So.2d 164
(Ala.Cr.App. 1986).
For the above reasons, the judgments of convictions are due to be, and are hereby, affirmed.
AFFIRMED.
All Judges concur.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; RULE 39(k) MOTIONS DENIED; APPLICATIONS FOR REHEARING OVERRULED.
All Judges concur.
[1] The Bayhis, who are father and daughter, will hereafter be referred to by their first names to avoid confusion.
[2] Newman is Astrid's husband. The records of the Circuit Court of Houston County show that Newman pleaded guilty to 6 counts of securities fraud; was found guilty, after a jury trial, of 19 counts of the unregistered sale of securities; and was sentenced to 8 years' imprisonment on each count. The sentences were split, and Newman was ordered to serve 3 years' imprisonment and 5 years' probation. The sentences were to be served concurrently. Newman did not appeal.
[3] The appellants do not question that the promissory notes constitute "securities" subject to regulation under the Alabama Securities Act. They clearly do in this case. To determine whether an investment contract is a security, one must focus on the economic realities of the underlying transaction. In considering the economic realities, the Supreme Court of the United States has established a three-pronged test: (1) an investment of money; (2) in a common enterprise; and (3) an expectation of profits from the managerial efforts of others.Securities and Exchange Commission v. W.J. Howey Co.,328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).