STATE of Utah, Plaintiff and Appellee,

v.

Ronald A. HARRY, Defendant and Appellant.

No. 920633–CA.

Court of Appeals of Utah.

April 14, 1994.

Walter F. Bugden, Jr., (argued), Salt Lake City, for defendant and appellant.

Jan Graham, Atty. Gen., David N. Sonnenreich and Charlene Barlow (argued) Asst. Attys. Gen., Salt Lake City, for plaintiff and appellee.

Before BENCH, BILLINGS and DAVIS, JJ.

## OPINION

DAVIS, Judge:

Defendant Ronald A. Harry appeals from a jury verdict finding him guilty of four counts of securities fraud in violation of Utah Code Ann. §§ 61-1-1 & -21 (1989). We affirm.

## I. FACTS

When evidence is in conflict in a jury trial, " 'we assume that the jury believed those facts that support its verdict, and we view the facts and the reasonable inferences that arise from those facts in a light most supportive of the jury's verdict.' " *Ong Int'l, Inc. v. 11th Ave. Corp.*, 850 P.2d 447, 449 (Utah 1993) (quoting *Bennion v. LeGrand Johnson Constr. Co.*, 701 P.2d 1078, 1082 (Utah 1985)). We therefore recite the facts in a light most favorable to the jury's verdict.

This case arises out of Harry's sale to three investors of interests in a real estate limited partnership known as the Red River Mountain Limited Partnership (Red River). At the time of the sale, Harry was a registered securities representative selling securities as an agent of Private Ledger, a licensed broker-dealer.

According to Private Ledger's rules, agents were not permitted to sell any securities that were not approved by Private Ledger unless the agent received prior written permission. An agent's sale of an unapproved security is referred to as "selling away." Selling away is prohibited under the National Association of Security Dealer's rules because it entails sale of a security that has, in most cases, not been reviewed by the broker-dealer to ensure the offering is legitimate and is something that the broker-dealer wishes to sponsor for sale. Selling away also deprives the broker-dealer of its share of commissions on a securities sale.

In late April and early May of 1988, Virl Thornton, Frank Brgoch and Seymour Isaacs purchased units of Red River from Harry at Harry's suggestion.[1] Thornton had known Harry and his family for approximately twenty years, and had invested through Harry several times in the past. Thornton purchased the units primarily because Harry told him that Harry and his father had invested in Red River also, and because he thought Private Ledger had approved the sale of Red River units.

Brgoch and Isaacs, two friends who are retired airline pilots, had both used Harry as their broker since the 1970s. Both men gave Harry limited discretionary trading authority. Prior to the purchase of Red River units, Brgoch told Harry that he was interested in no risk, short term investments and "posi-

---

1. Approximate amounts invested were: Thornton, $15,300; Isaacs, $31,000; and Brgoch, $30,-600.

tively no limited partnerships." Isaacs also told Harry that he was not interested in any investments involving risks or multiple payments, and he did not want to invest in any limited partnerships.

Red River turned out to be an investment that included the possibility of future annual payments as needed to support the project to its completion. The idea was to complete the project as soon as possible so that few, if any, annual payments needed to be made. Red River's Preoffering Summary set forth these details. However, Thornton, Brgoch and Isaacs all testified that Harry never told them of the possibility of future payments or showed them that portion of the Preoffering Summary covering future payments.[2] Also, when Brgoch and Isaacs received statements indicating that Harry had diverted funds from their accounts to purchase Red River units, they confronted Harry. Isaacs testified that when he questioned Harry about the transaction, Harry described it as "a one-time drop [of money], single investment . . . [and] there would be no further moneys involved in it."

In March of 1989, Red River notified the three investors that additional payments were due from them to support the project. All three were surprised and angry at the revelation.[3] The State subsequently brought charges against Harry for securities fraud. After a jury trial, Harry was found guilty of four counts of securities fraud: One count each for defrauding the three investors, and one count for defrauding his employer, Private Ledger.

The three counts involving Thornton, Brgoch, and Isaacs were based on Harry's misrepresentations and omissions concerning the nature of the Red River project, including the matter of additional payments from investors. The count involving Private Ledger was based on Harry's selling away Red River units without providing Private Ledger with its share of the commissions and his exposing Private Ledger to liability to the investors. According to trial testimony, Harry concealed the sale of Red River units from Private Ledger and did not receive permission to sell the units. Moreover, in a Private Ledger compliance questionnaire completed by Harry approximately five months after selling the Red River units, Harry denied that he had sold away any securities or received a commission on sold away investments.[4] Also, while employed at Private Ledger, Harry submitted weekly sales forms to Private Ledger indicating securities sold each week. Harry never included the sale of Red River units on any of the forms.

At trial, the State's expert testified, over Harry's objections, to the materiality of information that Harry allegedly failed to reveal to the three investors. The expert testified that it would be material to an investor that an investment had the possibility of future payments and that it was being sold away from a broker-dealer.

After the judgment and conviction were entered, Harry filed a Motion for New Trial or in the Alternative, Motion in Arrest of Judgment. Included in his motion was a claim alleging ineffective assistance of counsel.[5] A lengthy hearing was held on the motion, much of which centered on Harry's ineffective assistance claim. After hearing testimony from both Harry and his trial counsel, James Barber, the trial court en-

---

**2.** Brgoch also testified that after the investment in Red River had been made, he stopped by Harry's office to check on his accounts. Even then, Harry said only that he had invested some of Brgoch's money in real estate, and did not reveal that Red River was a limited partnership.

**3.** The Preoffering Summary actually called for the possibility of a maximum of thirteen annual payments, which if necessary, would increase the amount of the original investment substantially.

**4.** At trial, Harry claimed that he completed the questionnaire except for the two questions about selling away, and that someone else must have

answered those two questions. We assume that the jury may not have believed Harry on this point.

**5.** The ineffective assistance claim was based on Harry's allegations that trial counsel forgot to make an opening statement, failed to introduce a Subscription Agreement that would have contradicted Thornton's testimony that Thornton was not aware of the possibility of future payments, failed to demonstrate the three investors' alleged suitability for the Red River project, and failed to object to testimony that Harry's conduct violated Private Ledger's internal rules and regulations.

tered a detailed minute entry denying the motion.

On appeal, Harry challenges his convictions, claiming the trial court erred by: (1) denying his request for a jury instruction stating that specific intent to defraud is an element of securities fraud under sections 61–1–1 & –21; (2) denying his request to instruct the jury that a defendant's good faith is a complete defense to a charge of securities fraud; (3) permitting expert testimony as to the materiality of certain misrepresentations and omissions in a securities fraud case; (4) ruling that he did not receive ineffective assistance of counsel at trial; and (5) failing to dismiss counts II, III, and IV, which involved fraud perpetrated against Brgoch, Isaacs, and Private Ledger.

## II. ANALYSIS

### A. Specific Intent and Expert Testimony on Materiality

■ The bases for Harry's first three challenges to the convictions and judgment entered against him were addressed recently in *State v. Larsen,* 865 P.2d 1355 (Utah 1993). In *Larsen,* the Utah Supreme Court determined that specific intent to defraud is not an element of section 61–1–1(2).[6] The court noted that although section 61–1–21 subjects a person to a fine or imprisonment for "willfully" violating the securities fraud chapter,[7] that language does not indicate a requirement of scienter for a securities fraud conviction. *Id.* at 1358–59. Further, be-

cause a finding of specific intent is not a prerequisite for a conviction under section 61–1–1(2), the *Larsen* court determined that "the trial court properly refused to instruct the jury that good faith is a complete defense to criminal liability." *Id.* at 1368 n. 8.

Thus, *Larsen* effectively disposes of Harry's challenge concerning the mens rea necessary to convict under section 61–1–1. Therefore, the trial court did not err by refusing to instruct the jury that proof of specific intent was necessary to convict Harry.[8]

■ *Larsen* also governs Harry's challenge to use of expert testimony concerning the materiality of certain misrepresentations and omissions Harry allegedly made or failed to make. In *Larsen,* the trial court permitted the State's expert to testify that some of the information that Larsen omitted from securities documents would have been important or significant to an investor. *Id.* at 1360–61. The supreme court affirmed, noting that the testimony was not prohibited solely because it embraced an ultimate issue to be decided by the trier of fact. *Id.* at 1361 (citing Utah Rule of Evidence 704). The supreme court determined the testimony was admissible because it was not barred by Utah Rule of Evidence 704, and because expert testimony is normally appropriate and helpful to the jury in a securities fraud case. *Id.* at 1361–62. The decision reached by the court in *Larsen* applies directly to Harry's

---

**6.** Section 61–1–1 states:
It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly to:
(1) employ any device, scheme, or artifice to defraud;
(2) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
(3) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

**7.** Section 61–1–21 provides, in pertinent part, "Any person who willfully violates any provision of this chapter . . . or who willfully violates any rule or order under this chapter . . . shall upon conviction be fined not more than $10,000 or imprisoned not more than three years, or both."

**8.** *Larsen* discussed the issue of scienter only as it relates to section 61–1–1(2), and did not address the question of whether subsections 1(1) or 1(3) require scienter. *Id.* at 1357 n. 1. Here, the trial court instructed the jury that subsection 1(1), making it illegal to "employ any device, scheme or artifice to defraud," necessitated a finding of specific intent for conviction. However, the trial court refused to require specific intent for liability under subsections 1(2) and 1(3). Harry was charged under all three subsections of section 61–1–1, and from the jury's verdict, it is impossible to determine which subsections the jury applied to the four counts. Thus, an issue arises concerning the mens rea necessary for subsection 1(3). However, we do not reach the issue because Harry has failed to raise the same on appeal. *See State v. Villarreal,* 857 P.2d 949, 953 (Utah App.), *cert. granted,* 862 P.2d 1356 (Utah 1993).

challenge. We therefore affirm the trial court's ruling on this issue.[9]

### B. Effectiveness of Trial Counsel

 In order to prevail on an ineffective assistance of counsel claim, Harry must " 'show that [his] counsel's representation fell below an objective standard of reasonableness,' " and that there is a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *State v. Callahan,* 866 P.2d 590, 593, (Utah App.1993) (quoting *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). Harry lists several alleged errors committed by his trial counsel and claims that the individual and cumulative effect of the errors resulted in prejudice. We address Harry's assertions of attorney error with the reminder that " 'this court will not second-guess trial counsel's legitimate strategic choices, however flawed those choices might appear in retrospect.' " *Id.* (quoting *State v. Tennyson,* 850 P.2d 461, 465 (Utah App.1993)).

 First, Harry claims that trial counsel forgot to deliver an opening statement. It is true that counsel did not give an opening statement. From the transcript of the hearing on the motion for new trial or arrest of judgment, it appears that the decision to forego an opening statement was the product of at least some thought on counsel's part. The transcript reveals that counsel intentionally chose not to deliver an opening statement at the beginning of trial and instead reserved the right to give one after the State rested. Trial counsel testified at the hearing that he made a subconscious decision to forego an opening statement after the State concluded its case because he felt that he may have been losing the jury's attention and felt

that the jury would have appreciated the case moving along. He also said that he felt the jury had a good understanding of the defendant's case due to his cross examination of the State's witnesses. Although counsel's testimony is not perfectly clear on this issue, it appears that the decision to not make an opening statement was strategic and not merely an oversight.

Even if we did determine that trial counsel forgot to deliver an opening statement, we would still conclude that such failure did not prejudice Harry. There are several circumstances where it may be advantageous for counsel to forego an opening statement. Also, although this case entailed securities fraud, it was not so complicated that an opening statement would have been imperative. Finally, counsel did deliver a closing argument.[10] Therefore, counsel's failure to give an opening statement does not, in and of itself, undermine our confidence in the jury's verdict.

 Next, Harry challenges counsel's failure to introduce into evidence Thornton's Subscription Agreement, describing the details of the Red River Project. Harry claims that Thornton's notarized signature on the Agreement showed Thornton's knowledge of the nature of the Red River project. Introduction of the document, Harry argues, would have contradicted Thornton's assertions that he was not notified that Red River required additional payments. In its minute entry on the motion for a new trial, the trial court determined that counsel's failure to introduce the document was a tactical decision, and that its introduction may have hurt, rather than helped, the defense. The evidence adduced at the hearing and trial supports the trial court's conclusion. Also, there

---

9. Harry also objects to the expert's testimony that selling away is illegal. Harry claims expert testimony concerning the illegality of selling away was impermissible because it expressed a legal conclusion on a point that was not even an element of the crime of securities fraud. Harry argues that the information prejudiced the jury against him. We cannot accept Harry's argument on this point. The expert did not testify that Harry actually sold away from Private Ledger: That factual determination was left to the jury. Moreover, the fact that selling away is

prohibited is relevant to Harry's state of mind and the willfulness of his actions. We therefore see no error on the part of the trial court on this point.

10. In his reply brief on appeal, Harry argues for the first time that trial counsel's closing argument was also deficient. We will not address arguments raised for the first time in a reply brief. *State v. Brown,* 853 P.2d 851, 854 n. 1 (Utah 1992).

was some indication that although Thornton did sign the document, he did not have the opportunity to read it thoroughly and did not sign it until after the deal with Red River had taken place.[11] As the trial court noted, there was no guarantee that Thornton's answer to any questions concerning the document would have been helpful rather than damaging to the defense. In short, the failure to introduce the Subscription Agreement was not clearly in error. Moreover, because there is no evidence that the Subscription Agreement would have actually helped the defense, we cannot say that counsel's failure to introduce it prejudiced Harry.

■ Harry also argues that counsel erred by failing to question Thornton, Brgoch, and Isaacs sufficiently concerning their suitability as investors in Red River.[12] Harry claims evidence that Red River was a suitable investment for the three men would have contradicted their allegations that they did not wish to invest in that type of project. At the hearing on Harry's motion for a new trial, trial counsel testified that he refrained from questioning Brgoch and Isaacs at any length about their suitability for the Red River project because they had already testified that they specifically told Harry to stay away from limited partnerships. Counsel stated,

> I knew that both Mr. Brgoch and Isaacs were there to make a speech [about what they told Harry] and that every time I raised the issue, they made their speech. And so I thought it was damaging to go through the detail of [the investor's suitability for Red River] and that the return on that issue would not be very great.

This testimony reveals that the decision to refrain from questioning Brgoch and Isaacs was indeed tactical. Moreover, this logic would also apply to Thornton. Because counsel's decision was tactical, we cannot say that it fell below a reasonable level of representation.

■ Harry next claims trial counsel erred by permitting Private Ledger's compli-

ance officer to testify that Harry's selling away of Red River units violated the company's rules and regulations and exposed Private Ledger to the possibility of lawsuits by disgruntled investors. Harry argues that trial counsel should have objected to this testimony as irrelevant and inadmissible pursuant to Utah Rule of Evidence 403. The State counters that the information about Private Ledger's rules and regulations was relevant to show Harry's state of mind. The State argues that Harry's knowledge of the wrongfulness of selling away is probative of his willfulness in omitting material information about his selling away to Private Ledger and the three investors. With respect to the testimony that Harry's conduct could expose Private Ledger to lawsuits, the State claims the testimony was relevant to the jury's assessment of the materiality of Harry's omission of information concerning his sale of Red River. We agree with the State's evaluation of the evidence on the wrongfulness of selling away. The disputed testimony was relevant to Harry's state of mind, and it does not appear to have been unduly prejudicial under Rule 403.

Finally, Harry's claim that the alleged errors of his trial counsel, when taken together, have the cumulative effect of undermining confidence in the verdict is unwarranted. Although trial counsel appears to have given a less than stellar performance, sufficient evidence exists in the record to support the jury verdict. We cannot, therefore, say that trial counsel's performance in this matter undermines our confidence in the verdict.

### C. Motion to Dismiss Counts II, III, and IV

■ Harry's next claim on appeal is that the facts proven at trial do not constitute a violation of section 61–1–1 in counts II and III, finding him guilty of securities fraud in his sale of Red River to Brgoch and Isaacs, and count IV, involving securities fraud perpetrated against Private Ledger.

---

**11.** That testimony came out at the preliminary hearing, where Thornton testified and was questioned concerning the Subscription Agreement. The preliminary hearing transcript is a part of the record on appeal.

**12.** An investment is suitable if it meets that investor's requirements as to risk, probable return, and other factors.

In regard to counts II and III, Harry argues that there were no misrepresentations or omissions made "in connection with" the sale or purchase of Red River units as required by section 61–1–1. He claims he completed the transactions *before* he made any statements that could be characterized as misrepresentations or omissions, thereby taking his actions out of the ambit of section 61–1–1.

We need not determine whether omissions or misrepresentations made *after* a sale violate section 61–1–1 because Harry's actions *before* the sale constitute, at the least, omissions of material information. Both Brgoch and Isaacs told Harry prior to Harry's purchase of Red River units on their behalf that they were interested in low risk, short term investments and they were not interested in limited partnerships or other long-term investments. Harry's purchase of Red River units on their behalf therefore violated Brgoch's and Isaacs's specific directions and constituted an omission of material information. Harry had no authority to purchase Red River units for Brgoch and Isaacs. Therefore his continued omissions about the true nature of the investment violate section 61–1–1's prohibition against omitting material facts that are necessary in order to make previous statements (that he will only invest as instructed) not misleading. Harry deceived Brgoch and Isaacs both before and after the transaction, and he thus qualifies for conviction under section 61–1–1.

In regard to count IV, concerning fraud perpetrated against Private Ledger, Harry argues that any misrepresentations or omissions made by him constitute at the most a violation of his contractual obligations with Private Ledger and not a fraud made "in connection with" the sale of securities. The State claims we should adopt a definition that would encompass any fraud that "touches" a securities sale.

Although no cases exist interpreting the scope of the term "in connection with" in Utah's section 61–1–1, other jurisdictions provide general guidance on the issue. In interpreting Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (1981), and its accompanying Rule 10b–5, 17 C.F.R. § 240.10b–5, the United States Supreme Court stated, "Section 10(b) must be read flexibly, not technically and restrictively." [13] *Superintendent of Ins. v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). Other federal courts, following the Supreme Court's lead, have interpreted the "in connection with" requirement of section 10(b) broadly, determining that it encompasses any sale of a security where fraud "touches" the transaction. *See In re Fin. Corp. of Am. Shareholder Litig.*, 796 F.2d 1126, 1129–30 (9th Cir. 1986); *Arrington v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 619 (9th Cir.1981); *In re Am. Continental/Lincoln Sav. & Loan Sec. Litig.*, 794 F.Supp. 1424, 1434 (D.Ariz.1992). Moreover, those courts agree that the fraud does not have to be the "garden variety" normally associated with securities sales in order to state a cause of action under section 10(b). *In re Fin. Corp.*, 796 F.2d at 1130; *Arrington*, 651 F.2d at 619; *In re Am. Continental*, 794 F.Supp. at 1434.

In *Buffo v. State*, 415 So.2d 1158 (Ala. 1982), a case interpreting the meaning of "in connection with" in the Alabama Securities Act, the court stated that "the essence of the question becomes whether the fraud has a sufficiently close relationship to the purchase or sale of the security to make it actionable." *Id.* at 1164. In *Buffo*, the defendant misrepresented the value of land purchased by an insurance company, which in turn inflated the value of the company and kept it out of receivership temporarily.[14] *Id.* at 1166. The state department of insurance suffered substantial losses as a result of the fraud when

---

**13.** In *State v. Larsen*, 865 P.2d 1355 (Utah 1993), the Utah Supreme Court acknowledged the language similarities between section 61–1–1 and rule 10b–5, but opted not to apply federal precedent concerning the requirement of scienter to its interpretation of section 61–1–1(2). *Id.* at 1359. The supreme court's decision on that narrow issue does not mean that federal cases ad-

dressing different issues involving securities fraud are not analytically sound.

**14.** A security was involved because the insurance company issued a surplus note in exchange for the land.

the company eventually went into receivership. The court found defendant guilty of fraud "in connection with" the sale of a security even though the party harmed by the fraud, the insurance department, did not purchase or sell the security. *See id.*

The cases cited above instruct us here. Although count IV, characterizing Private Ledger as a victim of Harry's actions is not a common fact pattern, the harm and potential harm to Private Ledger occurred as a direct result of Harry's fraud. In his weekly sales forms to Private Ledger, Harry never revealed that he had sold away Red River units. Moreover, he affirmatively misrepresented the fact that he had sold away when he completed a Private Ledger compliance questionnaire after he purchased the Red River units on the investors' behalf. Private Ledger suffered harm because it did not receive commissions that it would be due if it had approved the sale. Furthermore, Harry's actions harmed Private Ledger by exposing it to potential lawsuits from the disgruntled investors. Harry's fraudulent statements and omissions to Private Ledger facilitated the sale of Red River units. Therefore, the fraud on Private Ledger had a sufficiently close relationship to the sale of the units to invoke section 61–1–1. Finally, as in *Buffo*, the fact that Private Ledger was not the seller or buyer of the securities is unimportant for purposes of section 61–1–1. We therefore hold that count IV is legally sufficient.[15]

### III. CONCLUSION

Harry's claims on appeal regarding the necessary mens rea under section 61–1–1, the validity of a good faith defense instruction, and the acceptability of expert testimony on the issue of materiality in a securities fraud case were decided against him in *State v. Larsen*, 865 P.2d 1355 (Utah 1993). · Harry

was not denied effective assistance of counsel. Finally, the trial court did not err in failing to dismiss counts II, III, and IV. Harry's convictions on four counts of securities fraud are affirmed.

BENCH and BILLINGS, JJ., concur.

---

**15.** In his reply brief, Harry asks us to strike addendum B to the State's brief. That addendum includes the State's entire brief submitted to the Utah Supreme Court in *State v. Larsen*. We agree that including a brief of this sort as an addendum is really an attempt to circumvent the page requirements for appellate briefs located in Utah Rule of Appellate Procedure 24(g). Pursuant to Rule 24(f), addenda are limited to relevant rules, statutes, regulations, or copies of parts of the record. Addenda should not be used to provide more argument in support of a party's position. Although Harry's request is somewhat moot because the *Larsen* opinion was issued prior to our decision in this case, his argument is well taken and we ask that parties refrain from taking this approach in the future.