**2025 UT App 179**

### THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
STEPHEN MENDOZA,
Appellant.

Opinion
No. 20230090-CA
Filed December 11, 2025

Fourth District Court, Provo Department
The Honorable Robert A. Lund
No. 211401805

Staci Visser, Attorney for Appellant

Derek E. Brown and Connor Nelson,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

HARRIS, Judge:

¶1      A jury convicted Stephen Mendoza of rape of a child and aggravated sexual abuse of a child. He now appeals the rape conviction, asserting that his trial attorney rendered ineffective assistance in various ways. For the reasons discussed below, we reject Mendoza's arguments and affirm.

BACKGROUND[1]

¶2 When Vanessa[2] was eleven years old, she told her mother (Mother) that Mendoza, her stepfather, was sexually abusing her. The next day, Mother took Vanessa and her younger brother (Brother) to the police station to make a report. That same day, Vanessa and Brother were interviewed at the Children's Justice Center (the CJC).

¶3 The first thing Vanessa told the CJC interviewer about the abuse was, "My dad had sex with me." She later identified her "dad" as Mendoza. She explained that Mendoza would call it "oh, yeah time." Vanessa even said that she was "scared [she] was going to get pregnant." She reported that Mendoza began abusing her when she was around four years old and that it happened "practically . . . every time [Mother] was working." Vanessa offered a description of some of the instances of abuse: she said that Mendoza "would have [her] pull [her] pants down" and lie "down on the bed," and "then he would take off his pants . . . [and] he would put it on [her]." She later described "it" as being "[h]is private part" that he uses to "[p]ee." She explained that Mendoza "would put it" on her "private part," which she clarified was the part that she used "[t]o go pee," and that Mendoza would move "it" "up and down" until "something [white] would splatter." And she said that during the incidents, Mendoza would say "oh yeah" and call her "good girl" and "princess."

¶4 Vanessa also told the CJC interviewer that there were times when Mendoza would "make [her] put [her] hand on it." She

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Popp*, 2019 UT App 173, n.1, 453 P.3d 657 (cleaned up).

2. A pseudonym.

described one such incident in detail, explaining that Mendoza "just had [her] sit there" with her clothes on, then he "took off his pants and his underwear" and "put . . . baby oil" on his "private part." Mendoza then had Vanessa "put one hand on top and just do it like up and down" "until something white squirted out." She also said that Brother knew about the abuse because, on at least one occasion when the family lived in Las Vegas, Brother "saw [her] putting [her] hands on [Mendoza's] private part."

¶5    During his discussion with a separate CJC interviewer, Brother reported that, "when [the family] lived in Las Vegas, [Mendoza] would make [Vanessa] touch his parts," but Brother explained that he only "saw it happen" once and that he "didn't see it very well." He reported that, when he was "five or four," he "saw [his] dad leaning down" over Vanessa, who was sitting on a couch. As soon as Mendoza saw Brother, he told Brother "to go back to [his] room." Then, when asked what Vanessa had told him about the incident, Brother reported that Vanessa had told him that Mendoza "said to touch his parts." The interviewer later asked Brother to describe what he "saw in the living room," and Brother claimed to have seen Mendoza with "no pants on," but then clarified that he "didn't know if [Mendoza] had no pants on." But in any event, he reported that Vanessa was "sitting down" and that Mendoza "was laying down," and that Vanessa was "touching [Mendoza's] parts" and that she "didn't like it." In Brother's interview, it is at times unclear whether Brother is describing events he personally witnessed or whether he is describing what Vanessa told him.

¶6    Mendoza was also interviewed after Mother reported the abuse to the police; the interview was recorded on video, and the recording is part of the record submitted to us. During the interview, officers asked Mendoza about Vanessa's allegation that he made her rub his penis with her hand until white stuff came out, and Mendoza responded as follows: "You know what? Fuck it. Yeah. That did happen just one time." Mendoza said that Vanessa had asked him about sex and he wanted to show her "this is what a penis looks like" so that she could get "all the

information at home." He said he eventually ejaculated after Vanessa "just reached for it" and he told her "this is what you gotta do . . . you just grab the stupid thing and just go up and down." But although Mendoza admitted to having Vanessa rub his penis with her hand, he repeatedly denied ever having rubbed his penis on Vanessa's vagina.

¶7 Ultimately, the State charged Mendoza with two crimes. The first count (Count 1), a first-degree felony, accused Mendoza of committing rape of a child. The second count (Count 2), also a first-degree felony, accused Mendoza of committing aggravated sexual abuse of a child.

¶8 While he was in jail awaiting trial, Mendoza made a series of phone calls to Mother. During one of those calls, he apologized to Mother multiple times and, in response to Mother asking if he did it because he was "drugged," he said, "Maybe it's because I was drunk my love. The truth is I don't know why I did it."

¶9 Before trial, the State filed a notice of its intent to introduce "other bad acts evidence as propensity evidence pursuant to rule 404(c)" of the Utah Rules of Evidence. In the notice, the State said it "intend[ed] to introduce and argue evidence of [Mendoza's] propensity to commit acts of child molestation" and that it would do so "through the testimony of [Vanessa]," in two different ways. First, it intended to introduce evidence that Mendoza "molested" Vanessa "on other occasions," presumably referencing occasions other than the two charged counts. Second, it stated that, because Mendoza "admitted to" Count 2, it intended to argue that Mendoza's "commission of [Count 2] makes it more likely that he committed the offense charged in" Count 1. Mendoza's trial attorney (Counsel) lodged no objection to the State's notice, and on the morning of the first day of trial, Counsel "stipulated to the admission of" the State's proffered rule 404(c) evidence.

¶10 At trial, during the State's opening statement, the prosecutor offered the following summary to the jury as to how it could utilize the rule 404(c) evidence:

> And in this case, you'll realize that the State has only charged one count of rape of a child, and one count of aggravated sexual abuse of a child. That doesn't mean we believe it only happened one time of each of those offenses. We charged, at our discretion, one charge for each. That means that you are allowed to consider the years and the frequent [incidents] to help you determine whether or not those two charges happened. They can help guide you in your decision.
>
> The fact that [Mendoza] admitted to having his daughter stroke his penis can help you determine whether or not he raped her, as you evaluate that evidence on its individual merits. And any other act[s] of molestation that you hear in this case are things that can help you determine whether or not he committed the acts in this case. But remember, we only charged one offense for each of those pieces of conduct.

At that point, Counsel opted not to offer an opening statement of his own, instead electing to "defer" any such statement "until after the State's case-in-chief."

¶11 In support of its case-in-chief, the State presented the testimony of several witnesses, including Mother, Vanessa, Brother, the CJC interviewers, and a police officer, all of whom testified about the events described above. During both Vanessa's and Brother's testimony, the video recordings of their respective CJC interviews were played.

¶12 During his testimony, Brother became very emotional, and the attorneys agreed to ask no further questions of him and to simply present the CJC interview recording. As that recording was being played, the court told the State to pause the video. Outside the jury's presence, the court and the attorneys discussed

the video, with the court offering its view that it "need[ed] to instruct the jury . . . to consider [Brother's] testimony only for what he observed through his senses" and to "disregard . . . anything that [Brother] says [Vanessa] told him." The attorneys agreed that such an instruction was proper. So, when the jurors retook their seats, the court offered the following instruction:

> During the publishing of . . . the CJC interview of [Brother], you heard [Brother] . . . relate events that he contends that he observed, and you heard him speak about things that he contends that [Vanessa] told him. I'm instructing you now to consider only what [Brother] said that he saw, himself. And I'm instructing you to disregard anything that he says that any other person told him.

¶13 Later in the trial, during a recess, a juror submitted a question to the court, asking, "[A]re we supposed to consider allegations/accusations from Las Vegas, or just the ones in Utah?" In response, the court gave the following instruction:

> The State of Utah has charged the defendant with two separate allegations. Those allegations relate to charged conduct that occurred in Provo, Utah at a specific residence. Those are the counts you're here to decide. Any other references to alleged sexual activity that occurred elsewhere in Utah, at different times in Utah, or in the State of Nevada . . . do not relate specifically to the charged conduct. The State has offered that evidence to assist you in evaluating your decision as to whether the State has proven Counts 1 and 2.

¶14 After the State rested, the court asked Counsel if he "intend[ed] to offer an opening statement," and Counsel responded that he was "actually going to waive that, [and] go

right into calling [Mendoza] as [the defense's] only witness." At that point, Mendoza took the stand to testify in his own defense.

¶15    Mendoza began by talking about his relationship with Mother, and he offered his view that, right before Vanessa made her allegations, his relationship with Mother "was real bad." He stated that he and Mother had been "arguing almost every day to the point where" Mother "assaulted" Mendoza by holding "a knife to [his] throat." Mendoza considered that instance to be "the last straw" in their relationship, and he testified that he then asked Mother for a divorce.

¶16    With regard to the jailhouse phone calls, Mendoza said he made the calls to express "remorse" to Mother for "everything [he] had done," including "the allegation [he] admitted to," presumably a reference to the penis-rubbing incident he discussed in his police interview. But he testified that the calls were not intended to convey remorse "for raping" Vanessa because, he said, "[T]hat didn't happen. I did not do that."

¶17    Mendoza also addressed his police-interview admission that Vanessa had rubbed his penis. He said he felt "really pressured by [the officer] just to . . . say something." Counsel asked Mendoza, "[W]hy did you tell the police about this baby oil situation?" Mendoza answered by saying, "I just couldn't take it anymore. I know what I did, and I wasn't going to hide from it. . . . So I felt like it was my responsibility to tell [the officer] exactly what . . . happened, and what I did." In further explaining himself, Mendoza claimed that Vanessa had asked him "what sex was" and that he "tried to explain it to her the best way possible, but she wasn't understanding," so he "showed her" his penis by way of explaining it to her and Vanessa "just ended up . . . reaching out for it," at which point "adrenaline started pumping" and "the situation happened."

¶18    After completion of the evidentiary presentations, the court gave final instructions to the jury. One of those instructions told jurors "to rely on [their own] memory of the evidence" if

something a lawyer said conflicted with their recollection. And another one discussed rule 404(c) propensity evidence, as follows:

> You've heard evidence the defendant committed acts of prior child molestation with [Vanessa], other than those charged in this case. This evidence was introduced to prove a propensity to commit the crimes charged. Keep in mind that the defendant is on trial for the crimes charged in this case, and for these crimes only.

In that same instruction, the court told the jury that it "may not convict [Mendoza] of the crimes charged simply because [it] find[s] that [Mendoza] committed these [other] acts, or that he had a character trait that predisposed him to commit the crimes charged." But the court told the jury that it "may consider these other acts as additional proof that the charged acts were committed." And in a different instruction, the court explained that Mendoza was charged with multiple counts, that the jury had a "duty to consider each charge separately," and that the jury's "verdict on one charge does not determine [its] verdict on any other charge."

¶19    After the instructions were read, the attorneys made their closing arguments. In the State's argument, the prosecutor reminded jurors that they should "[r]ely on [their] own memory" and that, if anything the prosecutor said was inconsistent with jurors' memories of the evidence, jurors should "go with what [they] remember." Later, the prosecutor specifically discussed Brother's CJC interview. He began by "remind[ing]" the jury of "what the judge instructed" regarding Brother's interview, namely, that the jury was "only to consider what [Brother] saw and heard himself" and not things Vanessa told him. The prosecutor continued the discussion through the lens of his own notes and told the jury, "[I]f your notes are different, . . . go with what you remember." With those caveats, the prosecutor then offered the following argument:

Here's my notes.

> [Brother] quote, "Only once I saw it happen. Saw Dad laying down and sister on couch. Dad had no pants on. My sister was touching his parts. Dad told me to go back to room."

¶20 The prosecutor also discussed the other-acts evidence, and he explained that the jury was permitted to "use" the "things that happened in Las Vegas" to help it "determine whether [the] two [charged] crimes were committed." In addition, the prosecutor argued that the jury was permitted to "use one count to help show that the other one happened." He pointed out that Mendoza "admitted to the aggravated sexual abuse of a child" and told the jury that it could "use that to help . . . show that [Mendoza] raped her" too. And the prosecutor added that the jury was also permitted to "use any of the other evidence, the Las Vegas incidents, . . . to show [guilt on] those two [charged] crimes."

¶21 In his closing argument, Counsel began by telling the jury that his "strategy" during the trial was not "to pick every battle" but instead was to "focus in on what really [the defense was] fighting against." In that vein, Counsel stated plainly that Mendoza was "not contesting" conviction on "Count 2, the aggravated sexual abuse of a child" charge. Counsel said, "[W]e're picking our spots," and that on Count 2 Mendoza "should be found guilty." But Counsel argued that Mendoza should be acquitted on Count 1, the count accusing him of raping Vanessa. And he argued that all of Brother's testimony, to the extent it was useful, went to Count 2 and not to the rape count. He also reminded the jury that, while Mendoza had admitted to Count 2, he had "steadfastly denied" the rape charge, and he asked the jury to acquit on that count.

¶22 After deliberation, the jury found Mendoza guilty on both counts, and the court later sentenced Mendoza to prison.

ISSUE AND STANDARD OF REVIEW

¶23    Mendoza now appeals his conviction on Count 1, the rape count, asserting that Counsel rendered constitutionally ineffective assistance. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *State v. Popp*, 2019 UT App 173, ¶ 19, 453 P.3d 657 (cleaned up).

ANALYSIS

¶24    To prevail on an ineffective assistance claim, a defendant must satisfy the two-part test from *Strickland v. Washington*, 466 U.S. 668 (1984). Under that test, Mendoza must show "(1) that trial counsel's performance was objectively deficient and (2) that such deficient performance was prejudicial." *Honie v. State*, 2014 UT 19, ¶ 31, 342 P.3d 182. "Because failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim, we are free to address [such] claims under either prong." *Id.* (cleaned up); *see also Strickland*, 466 U.S. at 687 ("Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."). Thus, "if either is lacking, the claim fails and this court need not address the other." *State v. Kufrin*, 2024 UT App 86, ¶ 55, 551 P.3d 416 (cleaned up). And with respect to the first part of the test, an attorney's performance is considered to be deficient "if the alleged conduct fell below an objective standard of reasonableness under prevailing professional norms." *State v. Samora*, 2023 UT 5, ¶ 20, 529 P.3d 330 (cleaned up).

¶25    In this case, Mendoza asserts that Counsel rendered ineffective assistance in three particulars: (1) by failing to object to what he calls "prosecutorial misconduct" when the prosecutor argued, during both opening statement and closing argument, that the jury could use evidence of guilt on Count 2 as propensity evidence supporting a conviction on Count 1; (2) by not objecting

to the State's mischaracterization of Brother as an eyewitness to instances of abuse; and (3) by offering no opening statement on behalf of Mendoza. We discuss each of these claims, in turn.

## I. Propensity Evidence

¶26    Mendoza argues that Counsel performed deficiently by not objecting when the prosecutor, during both opening statement and closing argument, argued that the jury was permitted to use Mendoza's admitted guilt on Count 2 as propensity evidence that could contribute to a finding of guilt on Count 1. Mendoza asserts that this argument is wrong and amounted to prosecutorial misconduct, because factfinders are not ordinarily permitted to use evidence of guilt on one charged count as propensity evidence regarding another charged count; indeed, Mendoza asserts that allowing this sort of argument serves to lower the State's burden of proof. On some of this, Mendoza might have a point: we can see potential problems with allowing factfinders, in most cases, to use evidence of guilt on one charged count as propensity evidence on another charged count. But on the facts of this case, where Mendoza admitted to the facts underlying Count 2 and even invited the jury to find him guilty on that count beyond a reasonable doubt, Counsel did not perform deficiently by opting not to raise an objection to the State's argument.

¶27    As a general rule, evidence of a person's prior bad acts is "not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). Such evidence is, however, admissible for non-character purposes. *See id.* R. 404(b)(2) ("[E]vidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."); *see also State v. Thornton*, 2017 UT 9, ¶ 58, 391 P.3d 1016 (stating that other-acts evidence is "presumptively admissible (subject to rule 402 and 403 analysis)" if there is an "avowed purpose beyond the *propensity* purpose" for admission of the evidence).

¶28 But when a defendant is accused of child molestation, "prosecutors need not go through the exercise of articulating a non-propensity purpose for evidence 'that the defendant committed any other acts of child molestation.'" *State v. Fredrick*, 2019 UT App 152, ¶ 42, 450 P.3d 1154 (quoting Utah R. Evid. 404(c)(1)). "[A]s a policy matter, . . . propensity evidence in child molestation cases can come in on its own terms, as propensity evidence, even if there is no other plausible or avowed purpose for such evidence." *Id.* Indeed, our rules provide that when "a defendant is accused of child molestation, the court may admit evidence that the defendant committed any other acts of child molestation to prove a propensity to commit the crime charged." Utah R. Evid. 404(c)(1).

¶29 Mendoza acknowledges all of this, and he does not contest the trial court's admission of evidence regarding various uncharged acts of molestation that Vanessa said occurred in Las Vegas. He acknowledges that evidence of these uncharged acts was admissible under rule 404(c) to prove propensity, and that the State was permitted to argue, from evidence that Mendoza committed the Las Vegas acts, that Mendoza had a propensity to commit both charged crimes. But he asserts that the State should not have been able to argue, from evidence that Mendoza committed the acts charged in Count 2, that Mendoza had a propensity to commit the acts charged in Count 1. And he supports this assertion by pointing out, correctly, that a factfinder must consider each offense separately and that there is a difference in the burden of proof when it comes to establishing the existence of an uncharged prior act versus a charged crime. From these premises, he argues that allowing the State to make the argument it made in this case had the effect of combining the two charges and lowering the State's burden of proof.

¶30 We agree with Mendoza's premises: separate charges must be considered separately, and there *is* a difference in the burden of proof between charged offenses and prior-bad-acts evidence. With regard to the first point, the trial court correctly instructed the jury that it must consider the charges separately. Indeed, it

explained that Mendoza had been charged with multiple counts, that the jury had a "duty to consider each charge separately," and that the jury's "verdict on one charge does not determine [its] verdict on any other charge."

¶31 And with regard to the second point, the existence of an uncharged prior bad act—whether admitted pursuant to rule 404(b) or rule 404(c)—need only be established by a preponderance of the evidence. *See State v. Lucero*, 2014 UT 15, ¶ 19, 328 P.3d 841 ("In the context of rule 404(b), similar act evidence is relevant only if the jury can reasonably conclude by a preponderance of the evidence that [1] the act occurred and that [2] the defendant was the actor." (cleaned up)), *abrogated on other grounds by Thornton*, 2017 UT 9; *State v. Estes*, 2025 UT App 10, ¶ 23, 564 P.3d 239 (stating that, "to admit evidence under rule 404(c), that evidence must support only a finding that a fact exists; in other words, that fact must be supported by a preponderance of the evidence"), *cert. denied*, 568 P.3d 261 (Utah 2025); *see also* Utah R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist."). But the existence of an act that forms the basis for a charged crime must be proved beyond a reasonable doubt. *See, e.g.*, *Estes*, 2025 UT App 10, ¶ 23 ("To convict a defendant of a crime, every element of the offense must be proved beyond a reasonable doubt.").

¶32 If one charged count could be used as propensity evidence for another charged count, then the State would only need to prove the existence of the propensity count *by a preponderance of the evidence*—even though its existence may not be proved beyond a reasonable doubt—in order to invite the jury to use it as evidence that could contribute to a finding of guilt on the other count *beyond a reasonable doubt*. And this might result in different charges effectively being considered together, rather than separately. Like Mendoza, we wonder whether this sort of maneuver is permissible, at least in most cases. And neither side points us to any Utah caselaw discussing this precise issue. At some point, we may need to decide the question definitively.

¶33　But we need not decide that question on its merits here in order to comfortably conclude that, in this case, Counsel did not perform deficiently by opting not to object to the State's argument. Here, there was no confusion about the separateness of the counts or about the burden of proof with regard to Count 2 because, even before the jury began its deliberation on that count, it had heard Mendoza admit the facts underlying that count and it had heard Counsel, during his closing argument, say that the defense had been "picking [its] spots" and that Mendoza "should be found guilty" on Count 2. On these unique facts, given the defense's acknowledgment of Mendoza's guilt on Count 2, a reasonable attorney could have believed that Count 2 had already separately been proved beyond a reasonable doubt and that any separateness or burden-of-proof problem had been eliminated.

¶34　Under these circumstances, then, Mendoza has failed to demonstrate that Counsel performed deficiently by opting not to object to the State's opening statement and closing argument about using Count 2 as propensity evidence for Count 1. On this basis, we reject Mendoza's first ineffective assistance claim.

## II. Brother's CJC Interview

¶35　Next, Mendoza asserts that Counsel rendered ineffective assistance by not objecting, during closing argument, to what Mendoza describes as the prosecutor's incorrect characterization of Brother's CJC interview. Mendoza argues that Counsel's failure to object to this "prosecutorial misconduct" was not objectively reasonable. We find Mendoza's argument unpersuasive here, however, because an objection would have yielded, at best, yet another instruction telling the jury that it could consider only Brother's actual observations, something the jury had already been told. In this situation, Counsel did not perform deficiently by opting not to lodge an objection during closing argument.

¶36　At trial, Brother's CJC interview was played for the jury and admitted into evidence. During that interview, Brother explained that he "saw" the abuse that occurred in Las Vegas only

once and that he "didn't see it very well." He described Mendoza "leaning down" over Vanessa on a couch and said that as soon as Mendoza saw him, Mendoza told him "to go back to [his] room." The interviewer also asked Brother to describe anything Vanessa had told him about the incident. Brother then described what Vanessa had relayed to him. But after that, the interviewer again asked Brother to describe what he "*saw* in the living room." (Emphasis added.) During this back and forth, Brother's accounts of what he personally observed and what Vanessa told him became somewhat muddled. And Brother could not provide additional clarity during his trial testimony, because he became very emotional and was not able to continue.

¶37   Then, during closing argument, the prosecutor discussed Brother's CJC interview and, as described above, he centered that discussion around his own "notes" that he had apparently taken as the recording of Brother's interview was played for the jury. He reminded the jury of the court's instruction that the jury was "only to consider what [Brother] saw and heard himself" and not things Vanessa told him. After that, the prosecutor described the contents of his notes to the jury, including assertions that Brother "[s]aw [Mendoza] laying down and [Vanessa] on couch," that Mendoza "had no pants on," and that Vanessa "was touching his parts." Mendoza argues that the prosecutor's description of Brother's interview further muddled the question of what Brother had seen with what Brother had been told, and Mendoza asserts that, to the extent the prosecutor was arguing that Brother *saw* some of those things, that characterization was inaccurate.

¶38   But the jury was already fully aware of the confusing nature of Brother's CJC interview statements. As noted already, the court instructed the jury—during the playing of the video recording of Brother's interview—that it should "consider only what [Brother] said that he saw, himself" and that it must "disregard anything that he says that any other person told him." And during the court's final set of instructions, it told jurors "to rely on [their own] memory of the evidence" if something a lawyer said conflicted with their recollection. And finally, we note

again that the prosecutor also reminded the jury that it was "only to consider what [Brother] saw and heard himself" and that, to the extent jurors' own notes were "different" from the prosecutor's notes, the jurors were to "go with what [they] remember[ed]."

¶39 Once the prosecutor had made his argument about Brother's testimony, Counsel had few options. He could have done nothing (which is what he chose). Or he could have objected to the prosecutor's argument,[3] in which case he might have succeeded in persuading the trial court that the prosecutor had mischaracterized the evidence. But even in that event, the remedy would have been yet another instruction from the court reminding the jury to consider only Brother's firsthand observations. A reasonable attorney could have decided to forgo asking for yet another instruction along these lines. *See State v. Houston*, 2015 UT 40, ¶ 76, 353 P.3d 55 ("When we review an attorney's failure to object to a prosecutor's statements during closing argument, the question is not whether the prosecutor's comments were proper, but whether they were so improper that counsel's only defensible choice was to interrupt those comments with an objection." (cleaned up)). Indeed, the presumption is that jurors follow the court's instructions. *See State v. Suhail*, 2023 UT App 15, ¶ 142, 525 P.3d 550.

¶40 Moreover, an objection might have served to emphasize certain aspects of the State's case that Counsel did not wish to emphasize. *See State v. Popp*, 2019 UT App 173, ¶ 50, 453 P.3d 657 (noting that asking for an objection and a curative instruction "may actually serve to draw the jury's attention toward the subject matter of the instruction and further emphasize the issue the instruction is attempting to cure"). We are reluctant to second-guess an attorney's choice in these circumstances. *See State v. King*,

---

3. Mendoza does not suggest that Counsel had options other than these. In particular, he does not argue that Counsel performed deficiently by opting not to move for a mistrial. Nor does he argue that Counsel should have lodged an objection to the language of any of the trial court's instructions to the jury.

2024 UT App 151, ¶ 33, 559 P.3d 96 (stating that "decisions regarding whether to move to strike and seek a curative instruction are highly strategic ones that courts are loath[] to second-guess").

¶41 Ultimately, Counsel did not perform deficiently by opting not to object to the prosecutor's argument regarding Brother's CJC interview. On this basis, we reject Mendoza's second ineffective assistance claim.

### III. Opening Statement

¶42 Finally, Mendoza takes issue with Counsel's choice to forgo an opening statement. But on the record before us, there were strategic reasons why Counsel may have opted not to offer an opening statement. Therefore, we cannot conclude that Counsel's performance was deficient.

¶43 "The purpose of an opening statement is to apprise the jury of what counsel intends to prove in his own case in chief by way of providing the jury an overview of, and general familiarity with, the facts the party intends to prove." *State v. Williams*, 656 P.2d 450, 452 (Utah 1982). In most cases, attorneys reasonably choose to offer an opening statement. *See ABA Criminal Justice Standards for the Defense Function*, Standard 4-7.5(a) (4th ed. 2017), https://www.americanbar.org/groups/criminal_justice/resources/ standards/defense-function/ [https://perma.cc/DLR3-V9PS] ("Defense counsel should be aware of the importance of an opening statement and, except in unusual cases, give an opening statement immediately after the prosecution's, before the presentation of evidence begins."). But in some cases, attorneys might have reason to choose not to do so, and that choice is a strategic one that is second-guessed only when it is unreasonable. *See, e.g., State v. Dew*, 2025 UT App 22, ¶ 64, 566 P.3d 53 ("In evaluating whether counsel was deficient, we will not second-guess trial counsel's legitimate strategic choices." (cleaned up)), *cert. denied*, 568 P.3d 264 (Utah 2025); *State v. Harry*, 873 P.2d 1149, 1154 (Utah Ct. App. 1994) (discussing the choice not to offer an

opening statement, noting that this choice could be strategic, and stating that such a choice, if "legitimate," will not be second-guessed, "however flawed" that choice "might appear in retrospect" (cleaned up)). Indeed, we have specifically held that "[t]here are several circumstances where it may be advantageous for counsel to" forgo offering an opening statement. *Harry*, 873 P.2d at 1154. In *Harry*, we observed that an attorney who "felt the jury had a good understanding of the defendant's case due to [the attorney's] cross-examination of the State's witnesses" and who "felt that he may have been losing the jury's attention and felt that the jury would have appreciated the case moving along" had a "strategic" reason to opt out of offering an opening statement at the beginning of the defense's case-in-chief, after deferring such statement at the beginning of the case. *Id.*

¶44 Here, Counsel had arguably more justifiable grounds to opt not to offer an opening statement. As in *Harry*, at the beginning of the case Counsel here opted to "defer" an opening statement "until after the State's case-in-chief." And as in *Harry*, Counsel opted not to offer any such statement at the conclusion of the State's case-in-chief. Instead, Counsel decided to just move "right into calling [Mendoza] as [the defense's] only witness." And in this case, Counsel had an apparent reason for doing so: he knew that he was going to have to concede guilt on Count 2 (as he eventually did in his closing argument). In this unique situation, delaying that concession until closing argument—after Mendoza had had a chance to testify—was perhaps a bold but not an unreasonable choice; Counsel could reasonably have wanted to try to avoid souring the jury's perception of Mendoza before he testified. In our view, and under the circumstances, Counsel's conduct did not fall "below an objective standard of reasonableness under prevailing professional norms." *State v. Samora*, 2023 UT 5, ¶ 20, 529 P.3d 330 (cleaned up).

¶45 Thus, Mendoza has not demonstrated that Counsel performed deficiently by opting not to offer an opening statement. And on this basis, we reject his third ineffective assistance claim.

CONCLUSION

¶46    Mendoza has not shown that Counsel rendered ineffective assistance in any of the ways he asserts. We therefore reject his arguments and affirm the trial court's judgment.

————————